PEOPLE, *for use of* NEW JERSEY TERRA COTTA CO.,
*v.* TRAVES.

1. EVIDENCE — CUSTOMS AND USAGES — WRITTEN CONTRACT — PER-
FORMANCE OF CONTRACT—SET-OFF AND RECOUPMENT.

In an action by a terra cotta company for the price of
material furnished to a contractor for use in the con-
struction of a school house, wherein the contractor sought
to recoup damages because the terra cotta did not comply
with the requirements of the contract, where it is con-
ceded that the work as furnished was different from that
shown in the architect's original plans, evidence that plain-
tiff prepared detail and working plans which were sub-
mitted to the architect, changed in some particulars, and
finally approved by him; that a general custom prevailed
to send the architect's plans to terra cotta companies and
have them adapt their construction to the architect's de-
sign, as shown by his plan; that defendant had knowledge
of this custom, and that the parties contracted with ref-
erence thereto, was not incompetent as tending to vary
the terms of a written contract, but, under proper in-
structions, was properly admitted for the purpose of pre-
senting to the jury the issue as to plaintiff's performance
and defendant's recoupment.

2. PRINCIPAL AND SURETY—STATUTORY BONDS—NOTICE—SCHOOLS
AND SCHOOL DISTRICTS.

Although Act No. 187, Pub. Acts 1905, § 2, requires the
subcontractor to give notice in writing to the board or
officers that he relies upon the security of the bond of
the principal contractor before payment is made, where-
upon he shall acquire the benefit of the security given
by the principal contractor, it is *held*, in an action by a
subcontractor against the surety on a statutory bond for
the construction of a school house, that notice served on
the school board after part of the material had been paid
for, but while there was still due to the principal con-
tractor on the general contract more than was owing to
the subcontractor, was a sufficient compliance with the act.

3. SAME—DEFENSES—ACTUAL INJURY.

Defendant company, being surety for profit, could not

benefit by plaintiff subcontractor's failure to give timely notice under Act No. 187, Pub. Acts 1905, § 2, where said surety has neither alleged nor proved any actual injury to it from such failure. *People* v. *Bowen,* 187 Mich. 257.

Error to Wayne; Van Zile, J. Submitted June 28, 1915. (Docket No. 54.) Decided September 29, 1915.

Assumpsit by the New Jersey Terra Cotta Company, in the name of the people of the State of Michigan, against William H. Traves, principal, and the Fidelity & Deposit Company of Maryland, surety, on the bond of Traves as contractor for the construction of a school house. Judgment for plaintiff. Defendants bring error. Affirmed.

*Donnelly, Lyster, Brennan & Munro,* for appellants.

*George F. & Peter J. Monaghan (John C. Shea,* of counsel), for appellee.

STEERE, J. On May 26, 1910, William H. Traves entered into a written contract with the Detroit board of education to furnish material and do the mason work in the construction of a certain high school building in said city. As required by Act No. 187, Pub. Acts 1905, he furnished a bond, with his codefendant, the Fidelity & Deposit Company of Maryland as surety, to pay—

"any subcontractor or by any such contractor or subcontractor as the same may become due and payable of all indebtedness which may arise from said contractor to a subcontractor or party performing labor or furnishing materials, or any subcontractor to any person, firm or corporation on account of any labor performed or materials furnished in the erection, repairing or ornamentation of such building, improvement or works." Section 3.

The plans and specification of this contract called for the use of a quantity of architectural terra cotta

as a part of the masonry. This Traves bought from the New Jersey Terra Cotta Company, a corporation, of Perth Amboy, N. J., for the benefit of and, in effect, by which this action was brought, contracting to pay therefor the sum of $11,680. The terra cotta company, called plaintiff herein, furnished the material as required, which was used in the building. It is claimed, however, that when and as furnished it was not in the condition contracted for, and Traves was put to much trouble and extra expense on that account, for which notice of recoupment is given under a plea of the general issue.

It appears to be conceded, and the court so instructed the jury without objection, that upon this contract for terra cotta Traves was in default and owing plaintiff the sum of $9,350.45, including interest, at the time the case was tried, provided plaintiff had fully performed on its part. A verdict was rendered against both defendants for $9,350, and judgment entered accordingly.

The case as presented by the pleadings and proofs involved two issues, one between plaintiff and the defendant bonding company only, in which the latter denied plaintiff's right of recourse to the bond, because it failed to give timely notice, as required by said Act No. 187, that it relied upon such security; the other being primarily between plaintiff and Traves, but an available defense for the surety also, in which it was denied that the material furnished, for the price of which this action was brought, complied with the requirements of the contract. Most of the evidence introduced and time consumed at the trial were devoted to the latter issue.

Traves received from plaintiff all the architectural terra cotta contracted for and used it in the high school building. The material and manner of using it in the

188 Mich.—27.

construction proved satisfactory to the architects in charge, and both were accepted. Traves contended, however, that the material was not "in accordance with plans and specifications made by Malcomson & Higginbotham, architects," as his contract with plaintiff provided it should be. The terra cotta was designed to be used chiefly for cornice work, and it is claimed the architects' plans show not only the general design of the cornice and kind of material, but the manner of construction, including size and shape of the terra cotta pieces, or blocks, indicating a comparatively small number of large blocks, simple, easy, and inexpensive to set in the wall, while that furnished consisted of a large number of small blocks, not economically fit or convenient for such construction, which caused a large amount of extra labor, delay, and expense to Traves in overcoming the difficulties this occasioned and properly setting the many small pieces. For the extra expense this imposed he claimed and sought to recover under his plea of recoupment $6,999.82, including interest. Upon this issue, conceding "that the question of whether the material furnished complied with contract was one for the jury, if all testimony objected to was properly admitted," counsel for defendants contend that it was not, and that upon this issue there is reversible error in the admission of incompetent testimony tending to vary the terms of the written agreement.

The contract between plaintiff and Traves for this material was in writing, evidenced by a proposal dated June 21, 1910, directed to and accepted by Traves. It provided, amongst other things, that the terra cotta plaintiff agreed to furnish would be "in accordance with the plans and specifications made by Malcomson & Higginbotham, architects."

Through its local agent in Detroit plaintiff had been in communication with Traves some time before he

secured his contract with the board of education, and from a copy of the plans furnished it had made him an estimate of the cost of the indicated terra cotta, with sketches showing the design carried out in construction. His contract with the board was signed in May, 1910, at which time he furnished the board an estimate showing in detail how he arrived at the price of $75,-880, for which the contract was let to him. His estimated cost of the terra cotta was $11,670, and for setting same $732. On June 21, 1910, he visited plaintiff's office in New York, taking with him copies of the plans and specifications, and went over the matter with plaintiff's president, Mr. Eskeson, as a result of which the written proposal before mentioned was made and accepted.

It is contended by defendants that what was said between the parties on that occasion was erroneously admitted in evidence, as well as other testimony relative to these plans, because it tended to modify or change them and with them the written contract of which they formed a part. These general plans of the building, of which both parties had copies before them, indicated for use in the terra cotta cornice longer and larger blocks than those actually used in the construction, showing them laid upon the wall so as to project over both sides. Mr. Higginbotham, the architect, testified, against objection, that those places did not particularly show the construction—"more the design and size"—and that the indication of large blocks extending the full width was an error in drafting, as terra cotta work was not generally constructed in that way. It is conceded that the original plans were not followed in that particular. The outward design and size of the cornice was the same, but smaller and thinner blocks of terra cotta than indicated on the general plan were used, which did not project into the wall its full width, being braced and held by metal supports.

Against this preserved objection that it tended to change or modify the terms of a written agreement, and was therefor incompetent, plaintiff was allowed to introduce a line of testimony by the architect, and others who qualified as experts, that it is the general custom in connection with such building contracts to send the architect's plans to terra cotta companies, and such other companies having subcontracts for special material, and have them adapt their construction to the architect's design, as shown by his plans, they furnishing the detail drawings and working plans, and that such course was followed in this case; that details and working plans were prepared by plaintiff, submitted to the architect, changed in some particulars according to his directions, and finally approved by him before the terra cotta was made and shipped to Detroit. Of this he testified:

"They make the setting plans and they take our design. * * * The expert terra cotta men could do it, but we do not propose to, and we never attempt to do it. We show the design. * * * The details are furnished to us and must conform to the scale drawing on which our bids for the work are based."

He further testified that the detail plans from the terra cotta company simply were put in better shape than the general plans, and were approved by him as architect. The president of the company with whom Traves closed the deal in New York was allowed to testify to the general custom and Traves' knowledge of it, and that the matter was all gone over by them and the contract made with reference to it, saying in part:

"I went over with Mr. Traves the drawing and our sketches. I showed him how we made our sketches. I went over that very thoroughly, and I explained to him what was the custom in terra cotta; that we figured the usual terra cotta construction all the time on our drawings and would ask to have our construction approved."

In *Karwick* v. *Pickands,* 171 Mich. 463, 471 (137
N. W. 219), the rule as to custom is stated as follows:

"It is said that all trades have their usages, and,
when a contract is made with a man about the busi-
ness of his craft, it is framed on the basis of its usage,
which becomes a part of it, except when its place is
occupied by particular stipulations."

Counsel for defendant plants his contention upon
the proposition that the construction adopted was dif-
ferent from that shown on the architect's plans and in
violation of the express stipulation that the terra cotta
was to be "in accordance with the plans and specifica-
tions" of the architect. The specifications of the archi-
tects under the subheading "Terra Cotta" provide,
amongst other things, that "all the details are to be
approved by the supervisor and architect." It is also
to be noted in connection with the question of under-
stood manner of construction that the agreement also
specifies:

"This contract does not include iron anchors or sup-
ports."

We think that this testimony tending to show a gen-
eral custom, known to both contracting parties who
made their agreement with reference to it, was com-
petent. This line of testimony was introduced to meet
defendant's claim of recoupment under the charge that
the material did not conform to the contract. Traves
testified that the contract was not made with reference
to any custom, that he knew of no such custom, and
relied upon the general plans with reference to which
he contracted, under which the construction was easier
and cheaper; that when the contract was made in New
York there was no talk with Eskesen about getting
out working plans, only he said they would have the
architect furnish details as soon as possible. His own
letters show that ten days later he wrote Eskesen from
Detroit:

"Send on working drawings to be approved by architect."

On July 18th he again wrote:

"Send along working drawings so I can get them approved by the architect and return to you."

On July 23d he wrote plaintiff:

"Just as soon as you send drawings and samples will have them examined and sent back."

They were sent August 22d, and the architect testified that Traves delivered them to him for approval, stating what they were, with a request that they be examined and approved. On August 29th Traves wrote plaintiff:

"Received your letter and drawings for terra .cotta on Cass high school and gave them to architects and your letter, and they have answered all questions in letter as you will see, and marked on plans."

Whether there was a custom, its nature and Traves' knowledge of it, and whether the parties contracted with reference to it, were questions opened to inquiry by the conflicting testimony, which fairly raised an issue for the jury, under the rule stated in *Pennell* v. *Transportation Co.*, 94 Mich. 247 (53 N. W. 1049). This was not precluded by the stipulation relative to plans, and the general plans furnished, for specifications also were equally binding, and details to be approved by the architect were required by the specifications. This is in harmony with the custom sought to be proved in explanation of the contract, rather than in exclusion of it. We find no error in admission of the testimony complained of or the charge of the court, which fully submitted to the jury, with a clear statement of the conflicting claims of the parties, this whole question of plaintiff's performance of the contract and

Traves' plea of recoupment, under proper instructions as to applicable rules of law for the jury's guidance. ‾

It is further urged that the court erred in denying the motion made in behalf of the defendant surety company for a directed verdict as to it on the ground that plaintiff failed to give timely notice that it relied upon the security of the bond in compliance with section 2 of said Act No. 187, which provides as follows:

"In the case of a subcontractor, he shall give notice in writing before payment is made for the work or materials furnished by him to the said board of officers or agents, that he is a subcontractor for the doing of some part of such work which he shall specify in his notice and that he relies upon the security of the bond by this act required to be given by the principal contractor, and that in the case of the giving of such notice to the said board of officers or agents said subcontractor shall also notify the principal contractor that he has done so, and whenever this shall have been done, the said subcontractor shall be entitled, subject to the rights of the persons with whom he has contracted for labor and materials, to the benefit of the security given by the principal contractor, and to be subrogated to the liens of the persons who have performed labor or furnished materials."

The title of this act is "to insure the payment of subcontractors and wages earned and materials used in construction, repairing or ornamenting public buildings and public works." It is to be noted that of those to whom payment is proposed to be insured section 2 only applies to subcontractors. No notice is required of laborers and materialmen. The object of the act is declared by its title to be to insure payment of all classes mentioned. The object of section 2 leaves much to conjecture. If this classification and these requirements were intended to protect the surety, as defendant claims, it would seem that either the act would require notice to be served upon the surety, or impose some duty on the municipal board or contractor,

who are notified. It does neither. Just what protection this section might afford the surety, beyond a technical defense in case the subcontractor forgot to serve the notice, is far from plain.

On August 14, 1911, plaintiff wrote the board of education, giving notice of its claim and requesting that it be retained out of any payments due Traves under his contract, but this notice was not in all particulars as specified in said section 2, and on October 11, 1911, a proper notice was served with special reference to the statute. At the time of the second notice there was yet coming to Traves upon his contract with the board over $15,000, but it is contended by defendant that the proof of estimates and payments made to Traves show he had finished the terra cotta work and received payment for it, less 15 per cent. retained until final payment on the contract, before this notice was served. Traves' contract provided for payment to him on the 15th of each month as follows:

"Within 15 per cent. of the sum which the said board of education shall determine to be a safe relative estimate of the value of the work done during the preceding month. The said estimates shall not be required to be made by such calculations, but may be arrived at approximately according to the judgment of the said board. It is expressly understood that such estimate shall only be made at the pleasure of said board, and no estimate shall be deemed an acceptance of the work on which it is made."

Under this Traves received his first estimate July 28, 1910, and on May 8, 1911, his ninth estimate. No portion of the retained 15 per cent. was paid him until after the second notice was served. His last payment of the entire balance due under the contract was received May 23, 1912. Estimates of work done upon the building were made up by the superintendent of buildings and furnished the board as a basis for allowance of partial payments. These were prepared by

Mr. Geering, then superintendent of buildings, who was not living at the time this case was tried. In making up his estimate he itemized the amounts against various parts of the work according to their degrees of completion, and then either figured the total value of work done since the previous estimate, less 15 per cent., or the total done from the beginning and its value, less the retained percentage, and found the amount of the proposed estimate by deducting previous payments. It may be conceded, as contended by defendant, that his estimates upon which payments were made include the value of the terra cotta work completed before the notice in question was given, less 15 per cent. The Traves contract with the board, however, required no separation of the different kinds of work. The estimates by the board upon which payments were to be made, were its determination of a safe relative estimate of the value of the work done, which might "be arrived at approximately according to the judgment of the board," at the pleasure of the board, "and no estimate to be an acceptance of the work on which it is made." In making its estimates and payments the board treated the contract as an entirety, and the records showed the payments made "on account of the contract." Neither the contract nor Act No. 187 require any schedule to be filed or estimate furnished as to any particular part of the work done and proportionate payment. It is conceded that when the notice was filed 15 per cent. of the cost of the terra cotta work was not paid, and it is shown that more than its total cost was yet unpaid upon the contract as a whole.

Under such a state of facts the provision of section 2 that notice shall be given "before payment is made for the work or materials furnished" is difficult of application. It was certainly not paid for in full; no direct payment was applied upon it. In payments upon

the contract as a whole, of which the terra cotta work was a part, the latter was necessarily paid in part. The act makes no provision for prorating surety liability.

In a case of this kind, where defendant is not entitled to notice, and the purpose of the notice is not made clear by the act, some consideration may be given to the general statement in *Ridgeway* v. *City of Escanaba*, 154 Mich. 68 (117 N. W. 550), that this court has "been inclined to favor a liberal construction of statutes requiring notice of claims." The contract of surety contains no condition or stipulation for notice upon any one. The condition of the bond is that Traves shall pay as the same may become due "all indebtedness which may arise from said contractor to the subcontractor, or party performing labor or furnishing material," etc., and section 4 of said Act No. 187 in plain language gives the right to bring an action on this bond to "any person, firm or corporation to whom any money shall be due and payable on account of having performed any labor or furnished any materials." This, without qualification or condition, gives all contemplated in the title of the act a right of action on the bond, with only the two conditions that the State shall not be liable for costs, and, in case of a subcontractor, he shall be required "to allege and prove that he has paid to all parties entitled thereto the full sums due to them for labor or material contracted for by him."

This condition suggests the query whether, in treating subcontractors as a special class, the legislative intent was directed to those only who contracted to assume and engage in a portion of the actual work of erecting the building upon the premises, rather than to those who under a contract of sale simply furnished to the principal contractor a commodity to be used by him in his contract. Under its contract plaintiff had

no direct connection with the erection of this building. It only sold to the contractor material of the kind it dealt in, manufactured in another State and shipped to him for use in his contract. In a sense every person who sold Traves any material for use in construction of the building and every laborer hired upon the job was a subcontractor. The only intimation, if such it be, given of where the lawmakers intended to draw the line is the condition in section 4. The title of this act is "to insure the payment of subcontractors," however classified, as well as laborers and materialmen, and section 3 of the act is plain and positive as to the conditions of the bond, which make no mention of notice, but, conceding that the bond given under the statute includes and is to be tested by all provisions of the statute, that plaintiff is a subcontractor in contemplation of section 2, required to give notice as provided, and that said section was for the protection of all interested, including the surety, and that, if damnified by failure or delay in giving notice, the surety is entitled to avail itself of the statutory provision, we find it alleged and proven that the statutory notice was given before the terra cotta was fully paid for, even under defendants' theory, and at a time when there yet remained due or to become due to the principal contractor much more than sufficient to satisfy plaintiff's claim. The only contention against complete compliance with the statute is that there was partial payment before notice. No statute in any other State is discovered containing a provision analogous to section 2 of said act. Counsel for defendant cite as similar a statute of the State of Washington requiring a surety bond from contractors on public works for completion of the work contracted for and for the protection of laborers and materialmen, which provides that:

"Such persons shall not have any right of action on

such bond for any sum whatever, unless within 30 days from and after the completion of the contract with ˻and acceptance of the work by the board," etc., the claimant file a prescribed notice with such board or public body, "and said notice, after being presented and filed, shall be a public record open to inspection by any person." Rem. & Bal. Code, § 1161.

It was held·that under the express wording of the statute the right to maintain an action upon the bond depended upon the giving of such notice, which was a public record and condition precedent, and, as liability on the bond ceased if notice was not given, the provision.operated for the benefit of the surety. *Huggins* v. *Sutherland,* 39 Wash. 552 (82 Pac. 112) ; *Crane* v. *Indemnity Co.,* 43 Wash. 516 (86 Pac. 849) ; *Robinson Manfg. Co.* v. *Bradley,* 71 Wash. 611 (129 Pac. 382). Although upon a similar subject, the provisions of the Washington statute are so distinctly at variance with the particulars under.consideration as to furnish scant precedent. There no distinction of beneficiaries or classification is attempted, no notice of claim or steps of any kind are required while the work is in progress or until 30 days after the contract is completed and accepted, and the required notice, when complied with, like the filing of a lien, becomes a public record, and that such record be made is an imperative condition precedent to any right of action. "Without such fact, no action could be maintained, * * * under the express terms of the statute." *Huggins* v. *Sutherland, supra.* This applied alike to all for whose protection the statute was enacted. The reasons governing those decisions upon that statute cannot be regarded as of controlling application to the provisions found in the act here involved.·

Aside from the foregoing considerations, we also are of the opinion that the defendant surety company is not in a position to benefit by plaintiff's alleged violation of the contract, in failing to give timely notice.

Upon this record the surety neither has alleged nor proven any actual injury resulting to it from plaintiff's failure to strictly comply with the requirements of the statute as to notice according to the construction contended for. The company being a surety for profit; this is a prerequisite as to it, under the particular facts of this case. The doctrine of *strictissimi juris,* said to be a rule of construction, as discussed and applied in the recent case of *People, for use of Townsend Brick & Contracting Co.,* v. *Bowen,* 187 Mich. 257 (153 N. W. 672), cannot be invoked by the surety under the circumstances disclosed here.

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY, who sat in this case, took no part in this decision.