SANDUSKY GRAIN CO. *v.* BORDEN'S CONDENSED MILK CO.

1. PRINCIPAL AND SURETY—BOND—STRICTISSIMI JURIS—CONSTRUCTION OF CONTRACT.

 While a surety company, not being a gratuitous surety, may not invoke the rule of *strictissimi juris*, courts may not arbitrarily read provisions out of or into its contracts in order to make it liable; its business being in the nature of insurance, rules applicable thereto are usually invoked by the courts in the construction of its contracts.

2. SAME—BUILDING CONTRACT—LIABILITY OF SURETY ON FAILURE OF OWNER TO COMPLY WITH MECHANIC'S LIEN LAW.

 Where, by the provisions of a bond given to assure the performance of a building contract, the obligee (owner) is to observe the mechanic's lien law (3 Comp. Laws 1915, § 14799), and he does not do so, but pays to the contractor without complying with its provisions and the terms of the contract, then such payments must be regarded as voluntary and not chargeable against the surety, on failure of the contractor to perform.

3. SAME—MECHANIC'S LIEN LAW—METHOD OF PAYMENT BY OWNER.

 The mechanic's lien law provides two methods of payment which may be made with safety, viz., requiring the sworn statement of the contractor, and distributing the money according to the statute among those who might acquire liens.

4. SAME—PROSPECTIVE PROFITS—CONJECTURAL.

 Prospective profits of a condensed milk company, claimed to have been lost through failure of the contractor to finish its building within the stipulated time, dependent upon the number of farmers who could be induced to furnish milk, the number and nature of the cows kept by each, etc., *held*, too conjectural to justify a decree for their supposed loss against the contractor's surety.

5. SAME—MECHANIC'S LIENS—VOLUNTARY PAYMENT.

 Where the contractor gave to a bank an order on the owner for $4,250, which was paid and the same was a

---

On release of surety on building contractor's bond by making payment not authorized by contract, see notes in 5 L. R. A. (N. S.) 418; L. R. A. 1915B, 407.

voluntary or advance payment, it was not chargeable against the surety on the contractor's bond.

6. APPEAL AND ERROR—STIPULATIONS—SUPREME COURT BOUND BY RECORD.

While the Supreme Court would not decline to give effect to a stipulation of all counsel, appearing in the record, it may not take counsel's claim that certain facts were admitted by opposite counsel, as amounting to a stipulation, where there is nothing to that effect in the record.

7. PRINCIPAL AND SURETY—CLAIM—MIXED ACCOUNT—EVIDENCE— SUFFICIENCY.

Where, on the contractor's default the owner took over the building and finished it, its claim against the surety for the amount paid to a certain workman must be disallowed where there was no proof as to how much was for work done before, and how much for work done after, the owner took over the building.

8. DISMISSAL—LIMITATION OF ACTION NOT AVAILABLE ON MOTION TO DISMISS.

The defense of the statute of limitations, being a bar to the action, must be pleaded in order to be available, and may not be invoked by a motion to dismiss, which under the judicature act (3 Comp. Laws 1915, § 12456) performs the function of a demurrer, plea in abatement, and plea to the jurisdiction, but not of a plea in bar.

9. MECHANIC'S LIEN—MATERIALMEN—MATERIAL FURNISHED AT SEPARATE TIMES NOT SEPARATE CONTRACT.

Although material for a building was furnished on three separate requisitions, there did not result three separate contracts requiring liens to be filed within 60 days after each delivery, but the filing of a lien within 60 days after the final delivery is sufficient under the mechanic's lien law (3 Comp. Laws 1915, § 14800).

10. SAME.

Nor did the act of the vice president of a building material company in referring the contractor to the manager of the brick department to fix the price on brick, after he had made prices on asbestos shingles and asphalt roofing, constitute the making of a separate contract for the brick; the record fairly showing that it was all one transaction.

11. SAME—DATE OF FILING LIEN—ADMISSIONS.

Where there was a conflict in the testimony as to the date of the filing of the lien, but the owner in its answer admitted that it was filed on the date claimed by the materialman, the action of the trial judge, who heard and saw the witnesses, in sustaining the lien, will be affirmed on appeal.

12. SAME—PAYMENTS—HOW TO BE APPLIED.

Where a hardware company was furnishing material for the building in question and also to the contractor on general account; the crediting of a payment of $300 to the general account, in the absence of any directions as to where to apply it, will not be disturbed, on appeal by the owner, and credited to the building, in the absence of proof that the money came from the owner.

13. SAME—LABOR LIENS—ASSIGNMENTS—STATUTES.

So called pay checks, although more in the nature of certificates stating the hours of labor performed and the amount due, given the laborers and cashed by a bank, were properly allowed as liens in favor of the bank, since the statute (3 Comp. Laws 1915, § 14820) expressly makes such claims assignable with the right to enforce the lien.

14. SAME—COSTS.

The surety company and such lienors as have filed briefs in this court are entitled to costs of both courts; lienors who have not filed briefs in this court are only entitled to costs of the circuit court.

Appeal from Sanilac; Beach (Watson), J. Submitted April 14, 1921. (Docket No. 88.) Decided June 6, 1921.

Bills by the Sandusky Grain Company and the Ionia Hardware Company against Borden's Condensed Milk Company and others to enforce mechanic's liens. Defendant Borden company filed a cross-bill to enforce liability against the Maryland Casualty Company as surety on the bond of the contractor. From the decree rendered, defendants Borden Company and Maryland Casualty Company appeal. Reversed, and decree entered.

\

*C. F. Gates,* for plaintiff Sandusky Grain Co.

*John Nichol,* for plaintiff Ionia Hardware Co.

*Clark, Emmons, Bryant, Klein & Brown,* for defendant Borden's Condensed Milk Co.

*Stevens T. Mason,* for defendant Maryland Casualty Co.

*C. F. Gates,* for defendants Parrish and Orr.

*John Nichol,* for defendant Detroit Lead Pipe Works,

*A. B. Simonson,* for defendants Toledo Plate & Window Glass Co., *et al.*

*Codd, Bishop & Kilpatrick (R. R. Weaver,* of counsel), for defendant David Lupton Sons Co.

*Robert W. McKenzie,* for defendant State Bank of Sandusky.

*Robert H. Cook (Raymond R. Kendrick,* of counsel), for defendant Saginaw Brick Co.

*Thomas A. Lawler* and *John F. Berry,* for defendant Briggs Co.

FELLOWS, J.    On April 12, 1917, defendant Borden's Condensed Milk Company entered into a contract with defendant Covell Construction Company for the erection of a condensing plant at Sandusky.    The contract price was $65,400; there were extras to the amount of $443.48.    The Covell company was to furnish the material and do the work.    The specifications, made a part of the contract, contained the following:

"Bond.
"The contractor is to give a bond payable to the company for the full amount of his contract to assure the carrying out of all the work contracted for.    Also insuring the Borden's Condensed Milk Co. against any loss due to defective materials or workmanship for a period of one (1) year.

"All work covered by these specifications to be completed within four (4) months from date of signing contract."

Defendant Maryland Casualty Company became surety on the Covell company's bond. It was a contractor's bond running to the Borden company. It contained among others the following clause:

"*Fourth.* That the obligee shall faithfully perform all the terms, covenants and conditions of such contract on the part of the obligee to be performed; and shall also retain that proportion, if any, which such contract specifies the obligee shall or may retain of the value of all work performed or materials furnished in the prosecution of such contract (not less, however, in any event, than ten per centum of such value) until the complete performance by the principal of all the terms, covenants and conditions of said contract on the principal's part to be performed, and until the expiration of the time within which liens or notices of liens may be filed, and until the discharge of such liens, if any; and the obligee shall at all times observe and conform to the laws relating to liens of the State wherein said contract is to be performed. That the plans and specifications mentioned in said contract are not in any respect defective, and are and at all times will be kept adequate for the complete performance of such contract, and that no change shall be made in such plans and specifications which shall increase the amount to be paid the principal more than ten per centum of the penalty of this instrument, without the written consent of the surety."

The Covell company commenced the work of constructing the plant and continued such work until October 12th when a receiver was appointed for it and the job abandoned. The Borden company had at that time paid the Covell company $48,141.33, but $39,095.41 of which was used on the Borden job by the Covell company, and but $37,610.41 of which had gone to pay for material and labor. All the payments had been made by the Borden company without re-

quiring of the contractor the affidavit provided for by the mechanic's lien law (3 Comp. Laws 1915, § 14799). There was no provision in the contract for payment upon architect's certificates but the contract provided for payment on the first of each month of 90 per cent. of the labor performed and material delivered and erected. The Borden company completed the building. Numerous liens were filed. One of the lienors, plaintiff Sandusky Grain Company, filed its bill. Within a few days another lienor, Ionia Hardware Company, did likewise. The two suits were consolidated. The other lienors came into the case asserting their liens by proper pleadings, and defendant Borden Company brought the casualty company into the case. A decree in favor of numerous lienors, and in favor of the Borden company and against the casualty company is here reviewed by the Borden company and the casualty company. The claims of the respective parties and the facts necessary to their understanding will be given only in so far as it becomes important to an understanding of the case and the grounds upon which it is disposed of.

Appeal of Maryland Casualty Co. The casualty company is a corporation engaged in the business of becoming surety for compensation. It is not a gratuitous surety and may not invoke the rule of *strictissimi juris*. *People* v. *Bowen*, 187 Mich. 257; *People* v. *Traves*, 188 Mich. 415; *Ladies of Maccabees* v. *Surety Co.*, 196 Mich. 27. But it is not deprived of the right to contract or to the benefit of contracts made. Courts may not arbitrarily read provisions out of or into its contracts in order to make it liable, or make new contracts for it and the obligees. Its business is in the nature of insurance and courts in the construction of its contracts usually invoke rules applicable to contracts of insurance. The bond in the instant case was a contractor's bond, a builder's

bond, the obligee was the owner; it was not a material-man's or laborer's bond. The Borden company is here seeking to recover upon it for its own benefit.

We shall consider but one claim of the casualty company which may be thus summarized: By the terms of the fourth clause of the bond above quoted the obligee Borden company was to observe and conform to the mechanic's lien laws of the State; it did not do so; it did not require the contractor to furnish the affidavit provided for in section 14799, 3 Comp. Laws 1915; nor did the money paid by it all go to liquidate the claims of the materialmen and laborers, but upwards of $10,000 of the sum so paid was not so applied; that this was a voluntary payment, beyond what the contractor was entitled to receive or the owner obliged to pay and released the surety.

We have spent considerable time in independent research upon this question and in order that such labor shall not be entirely lost to the profession, we shall at the expense of prolixity consider a number of the cases which such research has revealed together with those to which our attention has been called by counsel. Our attention is challenged by counsel to numerous decisions arising under Act No. 187, Pub. Acts 1905 (3 Comp. Laws 1915, § 14827). A brief consideration of some of these cases will suffice. In *People* v. *Finn,* 162 Mich. 481, the "use" plaintiff was held to be a sub-contractor, the notice required under section 2 (§ 14828) had not been given, the sureties were gratuitous sureties, and liability was denied. In *People* v. *Connell,* 195 Mich. 77, the surety was a compensated one; a notice not in all regards complying with section 2 had been given but the surety was in no way injured by such failure and liability was sustained. *People* v. *Traves, supra,* was quite similar. The object of section 2 was regarded as conjectural, the surety was a

compensated one, and was not harmed by the failure to give timely notice and liability was sustained.

In *Doyle* v. *Faust,* 187 Mich. 108, one angle of the question now before us was expressly reserved.    It was there said:

"What the rule should be in a case, where it appeared that payments made to the contractors were in the nature of profits and retained by them, we need not decide. It does not appear that all money paid was not used to liquidate demands for which, if unliquidated, the appellant would be liable."

In *Marquette Opera House Building Co.* v. *Wilson,* 109 Mich. 223, it was said by this court, speaking through Mr. Justice MONTGOMERY:

"Under this construction, the plaintiff had the right to protect itself by payment of any claims which were at the time liens, and upon which Wilson & Moore were in default, or to pay any claims which might mature into liens and upon which they were in default. But we think it was not within the contemplation of the parties that the plaintiff would be at liberty to make payments upon debts of Wilson & Moore for labor and material after such demands had ceased to be liens upon the property, and charge the sureties thereon.

"The parties are not agreed upon the question of fact as to whether the plaintiff failed to retain the 15 per cent. provided in the contract. If, in fact, the plaintiff failed to retain this much out of the estimates, and the payments made were voluntary,—that is, made upon claims which were not and could not become liens,—the obligation of the sureties would be reduced *pro tanto.*"

In *Backus* v. *Archer,* 109 Mich. 666, this court held (we quote the syllabus) :

"A surety on a bond for the performance of a building contract which provides that payments shall be made at specified times as the work progresses is released from all liability if the owner, without his consent, makes advances to the principal in excess of the amount due by the terms of the contract."

The Michigan cases considered are not directly in point, nor are we persuaded that any Michigan case cited by either counsel is directly in point.

We are persuaded that the last two cases are by analogy helpful. They are in accord with a long line of authorities we have examined and a portion of which we shall now consider. These cases are to this effect that where by the terms of the contract the payments are to be made upon architect's certificates, or where only a percentage of the amount earned is to be paid, payments made without such architect's certificates or in excess of the percentage due are voluntary payments and may not be charged against the surety. Some of the cases hold the surety is released entirely by such payments, others only *pro tanto*. Numerous cases will be found holding that such payments may not be charged against the surety unless the money so paid reached the materialman or laborer. These holdings are applied to both gratuitous and compensated sureties. The theory of the cases (and it is this theory which makes them analogous to the instant case) is that such provisions in the contract inure to the benefit of the surety as well as the owner. That where payments are made of a percentage only upon a certificate of the architect, a fund is held in reserve for the benefit of both owner and surety, and that it also furnishes an incentive to the contractor to complete his contract and receive his pay that he would not have if he already had his profits in his pocket.

A leading English case is *Calvert* v. *London Dock Co.*, 2 Keen, 638. In this case the contract provided for the retention of a percentage. This was not done; it was held that the surety was discharged, Lord Langdale saying:

"In this case, the company were to pay for three-fourths of the work done every two months; the re-

maining one-fourth was to remain unpaid for till the whole was completed; and the effect of this stipulation was, at the same time, to urge Streather to perform the work, and to leave in the hands of the company a fund wherewith to complete the work, if he did not; and thus it materially tended to protect the sureties.

"What the company did, was perhaps calculated to make it easier for Streather to complete the work, if he acted with prudence and good faith; but it also took away that particular sort of pressure which by the contract, was intended to be applied to him. And the company, instead of keeping themselves in the situation of debtors, having in their hands one-fourth of the value of the work done, became creditors to a large amount, without any security; and under the circumstances, I think that their situation with respect to Streather was so far altered that the sureties must be considered to be discharged from their suretyship."

The circuit court of appeals, third circuit, in *Fidelity & Deposit Co.* v. *Agnew,* 82 C. C. A. 103, 152 Fed. 955, thus stated the rule:

"The provision in a building or working contract that the contractor or builder shall be paid as the work progresses according to the amount of materials furnished or work performed, upon estimates to be made by the supervising architect, or engineer, whether a percentage is to be retained therefrom, until the whole is done or not, redounds to the benefit of a surety or guarantor of the party who is to fulfill the contract; and, upon payment being made in disregard of it, there is such a departure from the contract upon which the undertaking of the surety or guarantor is based that he is released. The purpose of such a stipulation is to guard against the consequences of a default, in case the principal contract proves a losing one, or the contracting party for any reason fails to comply, the percentage retained, where that is provided for, affording additional security, as well as holding out an incentive; and when it is not observed, and advance or overpayments are made, it is so obviously to the prejudice of

the surety that it operates as a discharge as matter of law."

In *National Surety Co.* v. *Long,* 79 Ark. 523 (96 S. W. 745), the court said:

"This clearly shows that Long either wilfully, or from a misconception of the meaning of his contract, or out of generosity to Humphreys, paid much more than he was entitled to pay under his contract and bond. We think his conduct in this regard released the surety company, because it affected the liability of the surety, and the clause in reference to this was not intended solely for the protection of the owner. * * *

"We have not overlooked the fact that the appellant in this case is not an accommodation surety, but is a paid surety, and we recognize the difference between them (*Remington* v. *Fidelity & Deposit Co.,* 27 Wash. 429 [67 Pac. 989]; *Walker* v. *Holtzclaw,* 57 S. C. 459); but we hold that a paid surety is only bound by the stipulations of his contract of suretyship."

The supreme court of Alabama in *First National Bank* v. *Fidelity & Deposit Co.,* 145 Ala. 335 (40 South. 415, 5 L. R. A. [N. S.] 418, 8 Ann. Cas. 241), thus held:

"We hold that under the contract and bond in this case, which constitute one transaction, if the plaintiff did not pay for the work and the material in the manner provided by the contract, but instead thereof, an arrangement made either at the time the contract was made, or afterwards, with the contractor, without the consent of the surety, permitted the contractor to overdraw over his account, so that considerable amounts of money were paid to him before any certificates were issued by the architect, and the material was paid for, without any estimate and before delivery, and without any regard to the retention of the percentage required, trusting to the certificates and estimates to be credited on said general account,—then this was such a departure from the terms of the original contract as to release the obligation of the surety."

Mr. Justice Bergen, speaking for the supreme court

of New Jersey in *Jersey City Water Supply Co.* v. *Construction Co.,* 76 N. J. Law, 419 (69 Atl. 1088), said:

"We are of opinion that under the bond and contract the surety was entitled to have twenty per cent. of each monthly estimate held until the completion of the contract, and that being entitled to such indemnity, where it is admitted, as in this case, that the twenty per cent., if retained and held in hand until the contractor abandoned the work, would have been sufficient to complete it, the payment of the twenty per cent. in advance releases the surety from liability."

The supreme court of North Dakota, speaking through Justice Bruce in *Long* v. *American Surety Co.,* 23 N. D. 492 (137 N. W. 41), and considering the case on rehearing, said:

"If plaintiff's evidence as to the cost of completion is to be relied upon, there would have been no profits, but rather a loss, so that there was every incentive for Gentry to abandon the work. If, on the other hand, the balance required by the contract and the bond had been retained by Long, he might have hesitated in abandoning the job for fear of losing the amounts so reserved. That such payments in violation of the conditions of a bond will release the surety is abundantly sustained by the authorities (citing a large number of authorities).    *    *    *
"We are not unmindful of the fact that a paid surety or bonding company is treated rather as an insurer than as a surety. 32 Cyc. p. 303; *Bank of Tarboro* v. *Fidelity & Deposit Co.,* 126 N. C. 320 (35 S. E. 588); 128 N. C. 366 (38 S. E. 908, 83 Am. St. Rep., 682). This fact, however, does not make it less obligatory on the part of the beneficiary to perform his part of the contract."

In *Kunz* v. *Boll,* 140 Wis. 69 (121 N. W. 601), it was said by that court:

"It was made to appear conclusively, however, and indeed declared by the findings, that the building was not completed until September 20th, and that as early

as June 9th there had been paid to the contractor the sum of $15,100, while by the express terms of the contract only $13,000 was to be paid to him prior to the final completion of the contract. The efficacy of substantial advance payments upon contracts to discharge sureties is too well settled by the authorities in this State to warrant discussion. The prejudicial effect thereof to the surety has been found both in the removal of the incentive to the contractor to diligently press his work and from the diminution of the fund which the contract contemplates to remain in the owner's hands and which may serve as a means of protecting the sureties from liability.".

We quote from the syllabus of the case of *Bessemer Coke Co.* v. *Gleason,* 223 Pa. 84 (72 Atl. 257):

"An essential part of a building contract required that fifteen per cent. of the amount due thereon should be retained until final settlement. Where the obligee, in disregard of this requirement, overpaid the principal, he cannot recover the amount of such overpayment from the surety upon the bond."

We likewise quote the syllabus in *Picard* v. *Shantz,* 70 Miss. 381 (12 South. 544):

"A stipulation in a building contract that payments shall be in fixed installments, the last when the house is completed, is a security for the execution of the contract, which inures to a surety of the contractor, and, to the extent that the surety is deprived thereof by the owner's act in anticipating payments, he is discharged."

In *Growall* v. *Pacific Surety Co.,* 21 Cal. App. 185 (131 Pac. 73), it was said:

"The surety cannot be charged with any voluntary payment that plaintiff may have made in excess of what he was legally liable for."

In *Leiendecker* v. *Indemnity Co.,* 52 Wash. 609 (101 Pac. 219), the court held that the surety was not released as matter of law by the payment of the contract price in advance where the contract did not name

a date of payment, but held that such payment was, in view of the provisions of the bond, a fraud upon the surety and released it, the court saying:

"There is a contractual relation existing by reason of this bond between the indemnity company and the appellant. This provision was accepted by the appellant when he accepted the bond as a specification of his duties in the premises; and it seems to us that it was a fraud upon the indemnity company to neglect to notify it that a payment had been made which was not disclosed in the contract upon which the bond was given, and the making of which rendered unavailing the provision in the bond just quoted. Having accepted the bond with a provision of this kind, we think the appellant is bound by such provision."

In *Morgan* v. *Salmon*, 18 N. Mex. 72 (135 Pac. 553, L. R. A. 1915B, 407), it was said:

"The surety had the right to specify the conditions under which it would be held liable. The obligee was not compelled to accept these conditions; but, having done so, he is bound by them. The provisions of the bond that 15 per cent. of the amount due for labor performed and material furnished be retained was obviously for the benefit of the surety, and without it therein the bond, no doubt, would never have been written. Had it been complied with by the obligee, not only would there have been a sum remaining in his hands for the protection of the surety, but there would also have been an additional incentive for the contractor to carry out the terms of his contract and go on and complete the building. By payment in full, the temptation for dishonesty was increased, and the hope of reward for further labor decreased. It made a different obligation that subjected the surety to risks for which it had not contracted. We can but conclude, therefore, that the failure of the obligee to retain 15 per cent. of the value of the labor performed and material furnished in the construction of the building was a material variation of the bond.

"Having reached this conclusion, it logically follows that the surety is released."

The question was before the supreme court of Kansas in the recent case of *Young Men's Christian Ass'n* v. *Ritter*, 90 Kan. 332 (133 Pac. 894, L. R. A. 1915C, 170), and was fully considered.  It was there said:

"No reason is suggested why a surety company may not by its contract require that the usual percentage of the building cost shall be retained until the building is completed and until it has notice of the default of the contractor and consents to the final payment.  We are impressed with the reason and justice of the rule that a surety company, although engaged in the business for profit, should be released from liability to the extent of any payments made in excess of the amount or in advance of the time expressly provided in the bond itself.  To hold otherwise would require the courts to make for the parties a new contract and one not contemplated at the time the contract sued upon was entered into."

See, also, *St. Mary's College* v. *Meagher*, 11 Ky. Law Rep. 112 (11 S. W. 608); *Bragg* v. *Shain*, 49 Cal. 131; *County of Glenn* v. *Jones*, 146 Cal. 518 (80 Pac. 695, 2 Ann. Cas. 764); *Black Masonry & Contracting Co.* v. *Surety Co.*, 61 Wash. 471 (112 Pac. 517); *Lawhon* v. *Toors*, 73 Ark. 473 (84 S. W. 636); *O'Neill* v. *Title Guaranty & Trust Co.*, 113 C. C. A. 211, 191 Fed. 570; *Blackburn* v. *Morel*, 13 Ga. App. 516 (79 S. E. 492); *St. John's College* v. *Indemnity Co.*, 201 N. Y. 335 (94 N. E. 994); *Warre* v. *Calvert*, 7 Adol. & El. 143.  Valuable notes will be found in 5 L. R. A. (N. S.) 418, and L. R. A. 1915B, 407.

If the provisions in the contracts under consideration in these cases inured to the benefit of the surety, and payments not in accordance with the terms of the contract are to be treated as voluntary payments, changing the terms of the contract, and are not chargeable against the surety, and these cases so held, then by a parity of reason we are persuaded it necessarily follows that where by the provisions of the bond the

obligee is to observe the mechanic's lien law of the State and he does not do so, but pays to the contractor without complying with its provisions and the terms of the contract then such payments must also be regarded as voluntary, changing the terms of the contract and not chargeable against the surety.    In *Smalley* v. *Gearing,* 121 Mich. 190, and in *Stevens* v. *Garland,* 198 Mich. 24, we called attention to the fact that the statute provides for two methods of payment which may be made with safety: *first,* requiring the sworn statement of the contractor; *second,* when the money is distributed according to the statute among those who might acquire liens.    The Borden company did neither, but paid upwards of $10,000 to the contractor for itself which neither its contract nor the mechanic's lien laws of the State obligated it to pay. This was a voluntary payment and may not be charged against the surety.

The instant case is so far as we have been able to ascertain practically a case of first impression.    The point seems to have been made in *Hardie* v. *Bateson,* 252 Pa. 317 (97 Atl. 464), but was not decided, the court remarking:

"Our attention has not been directed to any right provided by the laws of this State relating to liens, which the appellee neglected to observe and enforce to the prejudice of the appellant."

The syllabus in *Shreveport Mut. Bldg. Ass'n* v. *Whittington,* 141 La. 42 (74 South. 591), might be taken as favorable to the contention of the Borden company, but an examination of the case shows that the bond was a materialman's and laborer's bond and the case is not in point.    The case nearest in point which we have been able to find, and it is quite in point, is *Guilford Lumber Manfg. Co.* v. *Holladay,* 178 N. C. 417 (100 S. E. 597).    In this case the Greensboro

College for Women had paid the contractor without complying with the mechanic's lien law of the State, the contractor had not paid for all the material and labor, and it was sought to hold the surety for the amount of the liens. This the court declined to do, saying:

"In this case it was the plain duty of the college to withhold the sum necessary to pay these materialmen, as the law directed that the college retain the money and pay it to the person to whom it was due. When it paid the money to Holladay, instead of retaining it when it had full notice of the existence of claims of the materialmen, it was a direct violation of its duty and it would be inequitable to allow the college to take advantage of its own wrong and compel the surety to make good the default. He had a right to assume that the college would obey the statute, retain the money, and apply it to the claims of the materialmen. When the college paid the money belonging to the materialmen over to Holladay, trusting him to settle with the materialmen, it made Holladay its agent for that purpose, and whatever loss is sustained, it must bear."

As the amount of the voluntary payments were far in excess of the amount of the decree against the casualty company, it follows that such decree must be reversed.

Appeal of Borden's Condensed Milk Co. The Borden company appeals from numerous features of the decree. We shall first consider those having reference to the casualty company.

(a) The defendant Covell Construction Company did not complete the building before the receiver was appointed or within the time fixed by the contract. The Borden company finished the work and claims to have suffered damages by the delay. In its answer it claimed $10,000 damages; its controller claimed that such damages amounted to $50,000. The trial judge disallowed this claim, and we think correctly so. It was manifestly based on a claim for prospective profits.

These depended, as the evidence disclosed, upon the number of farmers who could be induced to sell milk to the company, the number of cows each might have, whether they were Jerseys, Holsteins, or Shorthorns, and other like contingencies. These prospective profits were too conjectural to justify a decree for their supposed loss. *Truman* v. *Threshing Machine Co.*, 169 Mich. 153.

(*b*) It would seem that the Borden company paid the State Bank of Sandusky $4,250 on an order signed by the Covell Construction Company. The testimony does not show whether it had been accepted by the Borden company or not. As we understand the record this was in addition to the payments considered when discussing the appeal of the casualty company; this, however, is unimportant. Some information is given with reference to this claim in counsel's brief which does not appear in the record. So far as the record discloses it was a voluntary payment or an advance payment. It falls within the reasons considered under the head of appeal of Maryland Casualty Company. In addition to the cases there cited and applicable to this particular claim, see the recent case of *Utter* v. *Leach*, *ante*, 31. The claim must be disallowed.

(*c*) One Charles V. Othoudt did some work on the building. He filed no claim of lien. Some of his work was done before and some after the Borden company took over the completion of the building. How much was before and how much after this date, the Borden company did not know at the time of the trial and was therefore unable to make its proof. The Borden company claims to be entitled to an allowance for such sums as it paid to Othoudt in completing the building after it took over the work, and counsel for the Borden company now makes a statement in the brief of what it is claimed that sum is, and makes the claim that all counsel admitted its correctness before the decree was

finally settled. But we must dispose of the case on the record before us. Upon the record as made we cannot allow this item. We would not, of course, decline to give effect to a stipulation of all counsel that the item should be allowed, but no such stipulation is now before us.

This leaves the objections made to numerous liens to be considered. The issue was made up and the case tried prior to the taking effect of the amendment to section 3 of Circuit Court Rule No. 26 so that we need not concern ourselves with the effect of that amendment.

(d) Saginaw Brick Company. The Borden company seeks to invoke the statute of limitations to defeat this claim. It does so by a motion to dismiss, but no such defense is set up in its answer. Counsel for the brick company make the point that the defense of the statute of limitations is not available on motion to dismiss. In this counsel is correct. In the recent case of *Vyse* v. *Richards*, 208 Mich. 383, we pointed out that the motion to dismiss under the judicature act (3 Comp. Laws 1915, § 12456) performs the function of a demurrer, pleas in abatement and plea to the jurisdiction, but that it does not perform the function of a plea in bar, and it was there said:

"Under the repeated decisions of this court the statute of limitations must be pleaded and the defense cannot be raised by demurrer. *Whitworth* v. *Pelton*, 81 Mich. 98; *Shank* v. *Woodworth*, 111 Mich. 642; *Renackowsky* v. *Board of Water Com'rs*, 122 Mich. 613; *First National Bank* v. *Steel*, 136 Mich. 588; *Township of Forest* v. *American Bonding Co.*, 180 Mich. 90. The defense is a bar to the action and should be so pleaded in order to be available."

Cases will be found where this court has under the former practice disposed of this question on demurrer and under the present practice on motion to dismiss,

but they are cases in which the point was not made. Here the point is made and insisted upon. It must be sustained.

The objection is also made by the Borden company that the material was furnished on three separate contracts and that the lien which was filed after the last furnishing was not within 60 days after the furnishing of the material under the earlier contracts. But we do not think the proofs sustain this contention, and as the defense of separate contracts is made to a number of the liens we shall dispose of it now. An examination of this record and the numerous briefs filed in the case leads us to the conclusion that counsel for the Borden company in making this claim overlook the difference between a "requisition" for material and the making of a new contract. On the erection of a building, material is needed from time to time as the building progresses. Rarely is all the material assembled before any work begins. Requisitions may be issued from time to time for material as it may be needed. But each requisition does not make a new contract requiring the filing of a separate lien, nor does the payment of bills as they accrue have that effect. In *Union Trust Co.* v. *Casserly,* 127 Mich. 183, where a somewhat similar claim was made, this court, speaking through Chief Justice MONTGOMERY, said:

"It is contended that the testimony shows that the contract was for the delivery of a specific amount of material, and that the delivery of other items was under separate contracts, and that therefore a lien should have been filed within 60 days after the furnishing of each item. 3 Comp. Laws, § 10714. We think this too narrow a construction of the statute. The correct rule is stated in Phil. Mech. Liens, § 229, as follows:

" 'Where work or material is done or furnished, all going to the same general purpose, as the building of a house or any of

its parts, though such work be done or ordered at different times, yet if the several parts form an entire whole, or are so connected together as to show that the parties had it in contemplation that the whole should form but one, and not distinct, matters of settlement, the whole account must be treated as a unit, or as being but a single contract.' "

The objections made to this lien are overruled.

(e) Detroit Lead Pipe Works. What has just been said with reference to the defense of the statute of limitations need not be here repeated; the defense is not properly raised. The claim of lien was filed October 24, 1917. It is insisted that this was not within the 60 days from the last furnishing; but Mr. Bale, credit manager of this company, testifies that the first furnishing of material was on August 15th and the last September 7th. Three invoices from this company appear in the record, the last one being dated August 28th. Even if this was the date of the last furnishing of material the lien was filed within 60 days thereafter.

(f) The Briggs Company. This company furnished asbestos shingles and built-up asphalt roofing and brick. The testimony of Mr. Ewer, the vice-president of the company, and that of Mr. Covell, called under the statute for cross-examination, are in harmony. Mr. Ewer talked with Mr. Covell and made him prices before the Covell Construction Company bid on the job. After its bid was accepted they arranged for furnishing material. The material was furnished on requisitions. What we have already said on the subject of separate contracts is here applicable. The further claim is made that because Mr. Ewer referred Mr. Covell to Mr. Anderson, who had charge of the brick department of the company, to fix the price on brick, that this made a separate contract for the brick. We do not so construe the testimony which fairly shows it was all one transaction.

There was a conflict in the testimony as to when the claim of lien was filed, some tending to show that it was filed after the service on the company. Defendant Borden company in its answer admitted that it was filed the day the Briggs company claimed it was filed. The trial judge, who heard and saw the witnesses, sustained the lien. We have no disposition to differ from his conclusion.

(*g*) Geneva Parrish and Peter Orr. What has been said disposes of the objections to this claim. They are overruled.

(*h*) Ionia Hardware Company. The Covell Construction Company was located at Ionia; the hardware company not only furnished material for the Borden job but also furnished it material on general account, the construction company having contracts at other places. A payment was made by the construction company to the hardware company of $300 which was credited on its general account in the absence of any directions as to where to apply it. The Borden company asks that it be now applied to here reduce the claim of the hardware company. There is no testimony in the case that this $300 came from the Borden job. In the absence of such proof we would not be justified in now making a change in its application from that made by the parties. At first there was some confusion in the proof as to when the claim of lien was served on the Borden company but before the proof was closed this was cleared up, and it appeared without dispute that it was served the same day it was filed. Other objections are disposed of by what has heretofore been said.

(*i*) Sandusky Grain Company. The objections to this claim are disposed of by what has already been said.

(*j*) Sebewaing Sandstone Brick Co. It is a sufficient answer to the objections now urged against this

claim that by the answer of the defendant Borden company sufficient of the material allegations of the cross-bill were admitted to justify the decree made.

(*k*) State Bank of Sandusky. So-called pay checks were issued to the laborers on the Borden building by the Covell company. They were not drawn on the bank but were made payable there. They were not in the form of a check but partook more of the form of a certificate stating the hours of labor performed and the amount due. Several laborers took them to the State Bank of Sandusky where they were payable. The bank took the checks paying the laborers therefor their face and was allowed a lien for the amount of them. We think this was proper. The transaction amounted to an assignment of these pay checks, of these claims for labor, to the bank. While the courts of a number of States hold that the right to a labor lien is a personal one and not assignable, our legislature has expressly made such claims assignable with the right to enforce the lien. 3 Comp. Laws 1915, § 14820. That no particular form of assignment is necessary and that the assignment of a labor claim carries with it the security of the lien with and right in the assignee to enforce it by appropriate proceedings is demonstrated by numerous decisions, among them see *Kinney* v. *Duluth Ore Co.,* 58 Minn. 455 (60 N. W. 23, 49 Am. St. Rep. 528); *Skyrme* v. *Mining Co.,* 8 Nev. 219; *McDonald* v. *Kelly,* 14 R. I. 335; *Hoagland* v. *Van Etten,* 31 Neb. 292 (47 N. W. 920); *Mason* v. *Germaine,* 1 Mont. 263; *Brown* v. *School District,* 48 Kan. 709 (29 Pac. 1069).

Costs. The Casualty company will recover its costs against the Borden company. Such lienors as have filed briefs in this court will also recover costs of both courts against the Borden company; lienors who have not filed briefs here will only be entitled to costs in the circuit court.

Upon the settlement of the decree in this court in accordance with this opinion the case will be remanded to the circuit court for the county of Sanilac, in chancery, for the enforcement of the decree.

STEERE, C. J., and MOORE, WIEST, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.