RAMADA DEVELOPMENT COMPANY,
a corporation, Plaintiff-Appellant,

v.

UNITED STATES FIDELITY & GUAR-
ANTY COMPANY, a corporation,
Defendant-Appellee.

Nos. 79–1076, 79–1077.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 5, 1980.

Decided and Filed June 10, 1980.

Merle R. Jenkins, Jenkins, Nystrom & Sterlacci, Southfield, Mich., for appellant, cross appellee.

John B. Kiefer, Kiefer, Allen & Cavanagh, Detroit, Mich., for appellee, cross appellant.

Before LIVELY and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

KEITH, Circuit Judge.

Plaintiff-Appellant Ramada Development Company (hereinafter "Radco"), appeals from the judgment of the district court discharging the defendant Surety, United States Fidelity & Guaranty Company (USF&G), pro tanto, for payments made by Radco to its electrical subcontractor (Mays Electric, Inc.) for work that Radco knew had not been completed by the subcontractor. Radco argues on appeal that the discharge was improper because: 1) the payments were actually used toward completion of the contract, which would ultimately benefit the Surety; 2) since there was no actual breach of any terms of its contract with the subcontractor, prepayment alone was insufficient to discharge the Surety pro tanto; and 3) the district court was unable to determine the amount of work actually completed by Mays before leaving the job.

Defendant-Appellee USF&G cross-appeals from the judgment of the district court granting Radco recovery for the sums that it paid the completion subcontractor to complete the job left unfinished by Mays.

Specifically, the Surety argues that the district court erred in computing the interest on the final judgment by assessing the interest from the date of payment to Trans-Pac, the completion subcontractor, and not from the date that the complaint was filed.[1] In addition, the Surety alleges error in the district court's computation of the amount by which it was discharged pro tanto from the payment of completion costs. USF&G argues that it should have been discharged for twenty percent[2] of the total contract price, plus ten percent retainage of that portion of the contract completed by Mays ($43,170.00), rather than for the amount of the December, 1973 and January, 1974 payments made to Mays by Radco, for which the work had not been completed ($32,-265.00).

We reverse the district court on the pro tanto discharge of the Surety for the reason that the Surety was not injured or otherwise prejudiced by Radco's payments to subcontractor Mays. We affirm the district court on its interest calculation from the date of payment to Trans-Pac on the basis of MCLA § 438.7, which permits interest to be calculated from the date that the award became fixed and ascertainable.

I.

Plaintiff-Appellant Radco was the general contractor for the construction of a ten-story, 253-unit, Ramada Inn in Southfield, Michigan pursuant to a contract dated February 16, 1972. Radco subcontracted the electrical work for the Inn to Mays Electric, Inc., pursuant to a contract dated August 14, 1972, requiring that Mays furnish a performance and labor and material payment bond surety satisfactory to Radco. The agreed upon price for the entire electrical job was Three Hundred Twenty Thousand Two Hundred Seventy-Five Dollars ($320,-

---

1. Payment was made to Trans-Pac on April 23, 1974; the complaint was filed in the United States District Court for the Eastern District of Michigan on January 25, 1976. The rate at which the district court computed the interest was six percent.

2. Presumably, the twenty percent figure is based on the estimates by Radco's Construc-

tion Administrator that the electrical job was between 75 and 80 percent complete at the time that Mays left. Because of the conflicting testimony on this point, and the insufficiency of other evidence, the district court found itself unable to make a finding as to the percentage of the work completed when Mays left the job.

275.00). Mays executed a performance bond on that same date in the penal sum of Three Hundred Twenty-Eight Thousand Twenty-Five Dollars ($328,025.00) guaranteeing its performance of the subcontract.[3] USF&G was the Surety on that performance bond.

During the course of its performance of the subcontract, Mays began to experience financial difficulties which resulted in a default on the contract. Unable to meet its payroll or pay for supplies, Mays voluntarily left the job at the end of February, 1974. Mays was paid by Radco Two Hundred Seventy-Eight Thousand Three Hundred Fifteen Dollars ($278,315.00); in addition, Radco paid Miller-Seldon Electric Company, a supplier of Mays, Seventeen Thousand Three Hundred Fifty-Eight Dollars ($17,358.00) for electrical supplies which Mays had ordered but for which it had not paid. The payments which were made to Mays were based on written monthly pay estimates executed by Mays for work completed in the preceding month and submitted to Radco for payment. Payments were made by Radco over the period beginning October 23, 1972 and ending January 17, 1974.

The district court found that Radco believed in the accuracy of, and reasonably relied upon, these sworn estimates of Mays, with the exception of the last two estimates dated December 18, 1973, in the amount of Twelve Thousand Four Hundred Sixty-Five Dollars ($12,465.00) and January 17, 1974 in the amount of Nineteen Thousand Eight Hundred Dollars ($19,800.00). With respect to these last two payments, the district court found that Radco was in fact aware that Mays had not completed all of the work claimed in the estimates, but that the payments were made in Radco's good faith belief that Mays would be able to complete the job it these payments were made, enabling Mays to meet its payroll and pay for supplies.

The parties stipulated in the district court that Radco was required to, and did, finish the job on which Mays defaulted by employing another electrical contractor. Radco hired Trans-Pac Construction Company of Los Angeles, California on a time and material basis, and paid Trans-Pac Two Hundred Eighty-Seven Thousand Four Hundred Sixty-Eight Dollars ($287,468.00) to complete the job, plus Twelve Thousand Dollars ($12,000.00) for additional work not included in Mays' contract. Payment was made to Trans-Pac on April 23, 1974.

In the district court, Radco sought a judgment against the surety USF&G, in the amount of Two Hundred Fifty-Six Thousand One Hundred Sixteen Dollars ($256,116.00)—the sum paid Trans-Pac for completion of the electrical work ($287,468.00), less the amount of Mays' contract which had not been paid to Mays ($48,710.00), plus the amount paid to Miller-Seldon for electrical equipment ($17,358.00). The district court awarded Radco Two Hundred Twenty-Three Thousand Eight Hundred Fifty-One Dollars ($223,851.00)—the sum that Radco paid Trans-Pac to complete the job ($287,468.00),[4] plus the sum paid Miller-Seldon Electric Company for supplies ($17,358.00), less the $48,710.00 retained by Radco, less the $32,265.00 for the last two payments made to Mays for which the surety was discharged—plus interest at six percent since April 23, 1974, the date payment was made to Trans-Pac.[5]

---

3. The contract that was originally signed by Mays on August 14, 1972 set the performance bond at the amount equal to the contract price, Three Hundred Twenty Thousand Two Hundred Seventy-Five Dollars ($320,275.00), but the parties stipulated to the district court that the contract price was adjusted to Three Hundred Twenty-Eight Thousand Twenty-Five Dollars ($328,025.00).

4. This sum does not include the Twelve Thousand Dollars ($12,000.00) that Radco paid

Trans-Pac for additional work not included in Mays' contract.

5. In addition to arguing that it should have been discharged for twenty percent of the total contract price ($43,170.00) rather than for the amount of the last two estimates ($32,265.00), and that the interest on the final judgment was improperly computed, Appellee Surety renewed claims on appeal that Radco failed to mitigate its damages when it hired an out-of-state contractor, Trans-Pac, on a time and material basis (rather than a local contractor on a

## II.

The first assignment of error raised by appellant in this case is that the pro tanto discharge of the surety was improper. Appellant argues that before a compensated surety can be discharged pro tanto, it must be shown that the obligee (here Radco) committed a material and substantial breach of its contract with the Surety's principal (here Mays) as well as that the Surety was damaged by any unauthorized payments.

While noting that Michigan law is not free of ambiguity on the subject of surety discharges,[6] the district court ruled that the discharge was proper on the basis of a 1921 Michigan Supreme Court opinion, *Sandusky Grain Co. v. Borden's Condensed Milk Co.*, 214 Mich. 306, 183 N.W. 218 (1921). In *Sandusky Grain*, the Supreme Court held that the surety was discharged when the obligee owner departed from the terms of its contract with the contractor and paid the contractor without requiring its compliance with the mechanic's lien law, as provided for in the contract. Such payments, substantial amounts of which were used toward completion of the contract, were held to be voluntary, and not chargeable against the surety, on failure of the contractor to perform. *See also, Park v. Brunswick-Balke-Collender Co.*, 235 Mich. 210, 209 N.W. 188 (1926).[7]

Appellant disputes the authority of *Sandusky Grain* for the instant case on two grounds. First, appellant argues that Radco made no material departure from its contract with Mays, making monthly payments in strict accordance with Mays' estimates, as provided for in the contract. However, it is clear that to the extent that Radco made payments to Mays with the knowledge that all of the work claimed on

fixed bid basis). Appellee further argued that the contract entered into by Radco with Trans-Pac was inefficient in that it required completion of the work in an unduly short time which necessitated overtime payments, as well as failing to provide for proper supervision of the time spent by Trans-Pac employees to such extent that the job was grossly overmanned and employees were idle. And finally, appellee argued that Radco was responsible for earlier delays in the construction project, that these delays delayed Mays' performance, and that Radco was therefore responsible for Mays being behind, so that all costs incurred in completing the job within the time demanded were caused by Radco and did not arise from Mays' breach of its contract.

The district court found that Radco acted reasonably in hiring Trans-Pac, even though it was an out-of-state contractor, in view of the uniqueness of the job, because Trans-Pac had previously performed similar jobs for Radco on a satisfactory basis. Moreover, the district court found that Radco acted reasonably in hiring Trans-Pac to complete the job on a time and material basis because it would have required approximately six weeks for any contractor to inventory the work completed and submit a fixed sum bid, assuming that Radco would have even been able to find a contractor who would undertake to submit a fixed bid on partially completed work.

The district court also found that Radco did examine and audit the invoices submitted by Trans-Pac to determine whether all sums claimed had been spent for labor and materials, and that Radco did disallow some expenses which were improperly claimed. The district court found further that the Surety was advised of Mays' default and that Trans-Pac had been retained to complete the job, and noted that the Surety had lodged no objection with Radco against Trans-Pac having been chosen at the time that it was notified that Trans-Pac would complete the job.

The district court concluded: 1) that Radco acted in good faith in hiring Trans-Pac, and that there was no collusion or disregard of the Surety's rights in Radco's agreement with Trans-Pac; and 2) that USF&G had failed to prove by a preponderance of the evidence that any delays caused by Radco delayed Mays in the performance of its work. As these findings are not clearly erroneous in light of the record, we accept them as fact.

6. *See Harvey v. George*, 207 Mich. 667, 175 N.W. 140 (1919), holding that although the plaintiff had failed to observe one of the conditions of a construction contract, the surety was not discharged from its obligation on the bond where the surety had not been prejudiced by that payment.

7. *Park v. Brunswick-Balke-Collender Co.*, 235 Mich. 210, 209 N.W. 188 (1926), held that as between the obligee and the surety on the contractor's bond, voluntary payments by the obligee to the contractor which did not reach the materialmen or laborers, which was not required by the contract, and was made without requiring the affidavit provided for by the mechanic's lien laws, operated to release the surety.

the estimates had not been performed—as the district court so found—Radco materially departed from its contract with the Surety.

Secondly, appellant argues that unlike the obligee in *Sandusky Grain*, the payments made by Radco were recycled back "into the job." While it is true that upwards of $10,000.00 of the $48,141.33 sum paid by the obligee in *Sandusky Grain* was not applied to liquidate the claims of the materialmen and laborers, we are of the opinion that the underlying reason for discharging the surety, as emphasized by the court's extended discussion, was the need to protect the surety's interest as a third party in the transaction.[8] The *Sandusky Grain* court concluded in light of the opinions cited therein that:

"If the provisions in the contracts under consideration in these cases inured to the benefit of the surety, and payments not in accordance with the terms of the contract are to be treated as voluntary payments, changing the terms of the contract, and are not chargeable against the surety, and these cases so held, then by a parity of reason we are persuaded it necessarily follows that, where by the provisions of the bond the obligee is to observe the mechanic's lien law of the state, and he does not do so, but pays to the contractor without complying with its provisions and the terms of the contract, then such payments must also be regarded as voluntary, changing the terms of the contract, and not chargeable against the surety." (214 Mich. at 320–21, 183 N.W. at 223.)

■ The district court, however, appears to have overlooked the development in a substantial number of jurisdictions, among which Michigan is included, of limitations on the discharge rule protecting sureties. This rule requires that some injury, loss or prejudice accrue to a compensated surety following a departure from the terms of the contract before a surety may be discharged. Mere immaterial or technical departures from the contract, not resulting in any damage to the surety, will not release the surety. *Doyle v. Faust*, 187 Mich. 108, 153 N.W. 725 (1915); *Harvey v. George*, 207 Mich. 667, 175 N.W. 140 (1919). *See also, Massachusetts Bonding & Ins. Co. v. John R. Thompson Co.*, 88 F.2d 825 (8th Cir. 1937), *cert. denied*, 301 U.S. 707, 57 S.Ct.

---

**8.** Among the opinions quoted approvingly in *Sandusky Grain* were *Fidelity & Deposit Co. v. Agnew*, 152 F. 955, 956 (3rd Cir. 1907).

"The provisions in a building or working contract that the contractor or builder shall be paid as the work progresses according to the amount of materials furnished or work performed, upon estimates to be made by the supervising architect or engineer, whether a percentage is to be retained therefrom, until the whole is done or not, redounds to the benefit of a surety or guarantor of the party who is to fulfill the contract; and, upon payment being made in disregard of it, there is such a departure from the contract upon which the undertaking of the surety or guarantor is based that he is released. The purpose of such a stipulation is to guard against the consequences of a default, in case the principle contract proves a losing one, or the contracting party for any reason fails to comply, the percentage retained, where that is provided for, affording additional security, as well as holding out an incentive; and when it is not observed, and advance or overpayments are made, it is so obviously to the prejudice of the surety that it operates as a discharge as a matter of law." (*Sandusky Grain*, at 315–16);

*Kunz v. Boll*, 140 Wis. 69, 121 N.W. 601, 602 (1909):

"The efficacy of substantial advance payments upon contracts to discharge sureties is too well settled by the authorities in this state to warrant discussion. The prejudicial effect thereof to the surety has been found both in the removal of the incentive to the contractor to diligently press his work and from the diminution of the fund which the contract contemplates to remain in the owner's hands and which may serve as a means of protecting the sureties from liability." (*Sandusky Grain*, at 318);

The court also cited, at 318, *Picard v. Shantz*, 70 Miss. 381, 12 So. 544 (1893), which held that a stipulation in a building contract that payments shall be in fixed installments, the last when the house is completed, is a security for the execution of the contract, which insures to a surety of the contractor, and, to the extent that the surety is deprived thereof by the owner's act in anticipating payments, he is discharged.

*See also First National Bank v. Fidelity & Deposit Co.*, 145 Ala. 335, 40 So. 415 (1906).

941, 81 L.Ed. 1361 (1937); *Winston Corp. v. Continental Casualty*, 508 F.2d 1298 (6th Cir. 1975), *cert. denied*, 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975). In *Maryland Casualty Co. v. Eagle River Union High School District*, 188 Wis. 520, 205 N.W. 926 (1925) the Wisconsin Supreme Court held that payments made without the architect's certificates required by the contract did not discharge the surety where it appeared that all of such payments were used by the subcontractor in the construction of the work covered by the contract, and that the subcontractor would have not been able to complete the work otherwise. The Wisconsin Court held that under these circumstances it could not be said that the surety was injured or prejudiced by such payments. *See also Harvey v. George*, 207 Mich. 667, 175 N.W. 140 (1919); *British American Tobacco Co. v. USF&G Co.*, 177 App.Div. 582, 164 N.Y.S. 406 (1917); *Phillips v. American Liability & Surety Co.*, 309 Pa. 1, 162 A. 435 (1932); *Pickens County v. National Surety Co.*, 13 F.2d 758 (4th Cir. 1926); *Maryland Casualty v. Dunlap*, 68 F.2d 289 (1st Cir. 1933).

The rationale for the rule limiting the discharge of sureties is best articulated by the New York Court of Appeals in *St. John's College v. Aetna Indem. Co.*, 201 N.Y. 335, 94 N.E. 994, 996–97 (1911):

"If money is given to a contractor or for his benefit by an owner, in advance of a payment becoming due upon a contract as a temporary loan, or for a special purpose, the amount thereof and the circumstances of the payment should be considered in connection with the obligation of the surety. The rule of strict construction is liable at times to work a practical injustice, and it ought not to be extended beyond the reason for the rule, particularly when the surety is engaged in the business of becoming a surety for pay and presumably for profit . . . [the money given in this case] was in the nature of a temporary loan for the express purpose of preventing an abandonment of the contract by the contractors and to avoid labor troubles. It was not made simply as a loan for the benefit of the owner and the defendant [surety] in case of a failure on the part of the contractors to complete their work. Such a loan or payment is not within the reason of the rule that prevents a recovery against a surety when his contract has been materially changed. The payments made cannot, under any view that can be taken of them, be said to remove in any degree the incentive that the contractors had prior thereto for completing the contract. If the rule invoked by the appellant is applied in this case, it would be both harsh and unjust."

■ In short, while we agree with the district court's finding that Radco departed from the terms of the contract in knowingly making payments to Mays for which the work had not been completed, we hold that its additional findings compel us to conclude that Radco's departure from the terms of the contract were neither material or substantial, nor prejudicial to the Surety's interest. These findings are: 1) that at the time that Radco made the payments on the estimates, that it, in good faith, believed that Mays would be able to complete the job if these payments were made by meeting its payroll and paying for supplies; and 2) that the two advance payments were in fact used by Mays to pay its employees and to further completion of the contract, and that the payments therefore benefitted the surety. We therefore hold that the discharge of the Surety in any amount was improper. Having reached this conclusion, we need not address appellee's second assignment of error, namely, that it should have been discharged for twenty percent of the total contract price rather than for the combined amount of the estimates knowingly paid for work which had not been completed.

In light of the foregoing discussion, our recalculation of appellant Radco's judgment against the surety is as follows: the sum paid Trans-Pac for completion of the electrical work, Two Hundred Eighty-Seven Thousand Four Hundred Sixty-Eight Dollars ($287,468.00) less the amount of Mays' contract which had not been paid to Mays,

Forty-Eight Thousand Seven Hundred Ten Dollars ($48,710.00) plus the Seventeen Thousand Three Hundred Fifty-Eight Dollars ($17,358.00) paid Miller-Seldon for electrical equipment, for a total amount of Two Hundred Fifty-Six Thousand One Hundred Sixteen Dollars ($256,116.00), at six percent interest from April 23, 1974, the date of payment to Trans-Pac. (See discussion below).

## III.

The second error raised on appeal in this case involves the proper calculation of interest on the final judgment award, an issue raised by the defendant-appellee Surety. Appellee argues that the district court erred in computing the interest on the final judgment by assessing the interest from the date of payment to Trans-Pac (the completion subcontractor), and not from the date that the complaint was filed, pursuant to MCLA § 600.6013.[9] However, while MCLA § 600.6013 does require that interest on a judgment be calculated from the date of filing the complaint, all of the cases cited by appellee invoking § 600.6013 are cases where the damages were unliquidated before final judgment—usually tort cases. We think that the relevant statute for the instant case is MCLA § 438.7. MCLA § 438.7 provides that;

> "In all actions founded on contracts express or implied, whenever in the execution thereof any amount in money shall be liquidated or ascertained in favor of either party, by verdict, report of referees, award of arbitrators, or by assessment made by the clerk of the court, or by any other mode of assessment according to law, it shall be lawful, unless such verdict, report, award, or assessment shall be set aside, to allow and receive interest upon such amount so ascertained or liquidated, until payment thereof or until

judgment shall be thereupon rendered; and in making up and recording such judgment, the interest on such amount shall be added thereto, and included in the judgment."

In *Banish v. City of Hamtramck*, 9 Mich. App. 381, 393–400, 157 N.W.2d 445, 450–54 (1968), the Michigan Court of Appeals addressed the distinction, embodied in these two statutes, between interest on a final judgment or statutory judgment interest (§ 600.6013), and interest included as an element of damages or prejudgment interest (§ 438.7).

> "We note that under C.L.S.1961, § 600.-6013, as amended by P.A.1965, No. 240, interest on a judgment may now be recovered from the date the complaint is filed. Our Court has held that the amended statute does not apply to complaints filed prior to the amendment's effective date, even though the judgment itself be entered subsequent to the effective date. *Swift v. Dodson* (1967), 6 Mich.App. 480 [149 N.W.2d 476]. In *Swift*, our Court carefully noted the distinction between interest on a judgment, which is purely statutory, and interest included as an element of damage. We are now concerned with the latter.

\*　　\*　　\*　　\*　　\*　　\*

Each of the contending parties presents an array of cases tending to support his point of view. In our effort to achieve a meaningful explanation, we have been greatly aided by Charles T. McCormick's perceptive work, *McCormick on Damages* (1935), §§ 50–59; pp. 205–233. He explains that when we inherited England's common law, legal thinking had just recently gone beyond the theretofore accepted view that all compensation for the use of money was to be condemned as usury. Through a redefinition of terms,

---

9. MCLA § 600.6013, as amended, provides in pertinent part that:

> "Interest shall be allowed on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint at the rate of 6% per year unless the judgment is rendered on a

written instrument having a higher rate of interest in which case interest shall be computed at the rate specified in the instrument if such rate was legal at the time the instrument was executed. In no case shall the rate exceed 7% per year after the date judgment is entered."

'usury' had been gradually restricted to excessive exactions for the use of money, and the term 'interest' had come to describe permissible compensation.

\*　　\*　　\*　　\*　　\*　　\*

The concept that interest should be allowed as part of the damages for a delay in paying the principal damages was not readily accepted. As the law developed exceptions were made, and in particular cases the jury, or the trial judge as a matter of discretion, was permitted to allow interest as part of the damages. As case law defined those areas in which interest would be assessed as part of the damages, restrictions were placed on the unfettered exercise of jury and trial judge discretion.

It came to be a familiar principle that generally interest will be included as a matter of right where the amount claimed is 'liquidated,' but not where the claim is 'unliquidated.' Definitions of 'liquidated' were not always consistent, and close cases created much confusion, until even the liquidated-unliquidated standard approached coalescence. In *Cree Coach Company v. Wolverine Insurance Co.* (1962), 366 Mich. 449 [115 N.W.2d 400] interest was allowed from the date of loss on an unliquidated amount which, said the court, 'was known or could have been easily ascertained' (p. 463 [115 N.W.2d 407]). McCormick contends that interest should be includible except where the damages are 'at large' and thus, in the last analysis, depend upon the discretion of the trier of fact uncontrolled by any meaningful standard except overall reasonableness. *McCormick on Damages*, § 57, page 226."

The *Banish* court went on to quote from an 1894 case, *Taylor v. Bay City Street Railway Company*, 101 Mich. 140, 146, 59 N.W. 447, 449 (1894):

"The ' old rule undoubtedly was that interest could not be allowed upon unliquidated damages, and, in actions of tort, damages are of course unliquidated. The tendency of courts has been, however, to set this rule aside, and adopt the more reasonable one, in cases of injury to property, that the jury must first determine the actual damage sustained, and allow interest upon that sum from its date."

The *Banish* court concluded:

"We are persuaded [that] the Michigan cases that allow interest as part of the damage in order to accomplish full compensation focus on the objectively sound facet of the matter. Although that principle seems clear, the difficult question of what is full compensation, neither excessive nor inadequate, is still very much with us. At one end of the spectrum, the allowance of interest as part of the damage for delay in paying an agreed sum presents no problem. At the other end, there is understandable reluctance to allow addition of an amount for interest to what is essentially a discretionary award, e. g., for pain and suffering, ungoverned by any standard other than overall reasonableness.

\*　　\*　　\*　　\*　　\*　　\*

In fashioning sensible rules of law, the disallowance of interest to avoid excessive compensation makes sense, not because the damages are unliquidated or otherwise uncertain but because to add interest would be redundant.

The allowance of interest here would not result in more than full compensation.[10] It is apparent that not to allow interest would be to deny full compensation. As a result of the delay in payment, the defendant city has had the use of plaintiff's money, in whatever amount ultimately is found due and without re-

---

**10.** *Banish v. City of Hamtramck, supra,* involved a class action instituted on March 1, 1965 by retired policemen and firemen against the City of Hamtramck, seeking to recover amounts due on their pensions. The Michigan Court of Appeals held for plaintiffs, granting them the amount due on their pensions (to be determined by the Wayne County Circuit Court on remand) plus interest from the date of the demand on City Council (August 24, 1964) for those who signed the petition, and from the date of its denial (September 29, 1964) to all other members of the class.

gard to when that computation was or could have been made, and plaintiffs have been denied the use of those funds. Irrespective of when the principal damages are computed, the nature of the elements that make up the principal damages preclude an excessive award. The addition of interest thereto is not redundant, but rather is essential to avoid inadequate compensation."

Whether or not we attempt to breathe life into the "liquidated-unliquidated" damages distinction, it is clear in this case that the amount that Radco paid out to Trans-Pac, the completion subcontractor, (less the amount retained by Radco on its contract with Mays) became a "fixed and ascertainable" [11] loss on Radco's account for which the surety, USF&G Co., was liable. In *Hi-Way Electric Company v. Pathman Construction Company*, 404 F.Supp. 398 (E.D.Mich.1971) the court applied MCLA § 438.7 in a situation similar to the instant case. In *Hi-Way*, an electrical subcontractor on a government project brought an action under the Miller Act against the prime contractor to recover sums allegedly due under the subcontract. The district court awarded the subcontractor the amount due him under the subcontract, plus interest on the award from the time the amounts became fixed, which was the date on which the subcontractor completed its punch line list items. As of that date, the district court reasoned, both Hi-Way's right to recover as well as the amount due and owing to it from Pathman was fixed and certain, and therefore, the case came within the provisions of the Michigan statute, MCLA § 438.7, which made it lawful to award such interest in contract cases. The federal court in *Hi-Way* based its reading of Michigan law on *Currie v. Fiting*, 375 Mich. 440, 454, 134 N.W.2d 611, 616 (1965) where the Michigan Supreme Court, in awarding interest on a judgment in a wrongful death action from the date of the accident, said, "Where a claim accrues as of a certain date and can be ascertained or computed as of that date, we think the better rule is to award interest upon the claim from that date forward."

In 1970, the Michigan Court of Appeals addressed the apparent conflict between *"Currie"*-type interest, which provides interest from the date of injury to the date of the judgment, and the statutory interest, MCLA § 600.6013, which provides interest from the date of the complaint until the judgment is finally paid. In *Vannoy v. City of Warren*, 26 Mich.App. 283, 287–89, 182 N.W.2d 65, 68 (1970), aff'd. 386 Mich. 686, 194 N.W.2d 304 (1972), the court said:

"When *Currie* was decided the statute in effect provided for interest on judgments only from the date of judgment until the date of payment. The purpose of the *Currie* opinion was merely to extend the allowance of interest, as part of damages, to the time preceding judgment in wrongful death actions.

This Court has often noted the distinction between interest on a judgment, which is purely statutory, and interest as an element of damages. The latter is awarded by the jury as part of the general verdict. The former is computed on and added to the general verdict. Yet, both types of interest serve the same basic function: to compensate the plaintiff for the loss of the use of funds.

\* \* \* \* \* \*

As the Court in *Currie* intended only to make plaintiff whole, we believe that the statement in *Currie* that interest is computed from date of injury to date of verdict was not intended to be a hard and fast rule to be applied irrespective to statutory change. Rather, it was a policy statement made within the context of then existing statutory provisions. Therefore, the effect of the statute was to supersede a portion of the dictum in

---

11. Liquidated damages are those damages which are reasonably ascertainable at the time of the breach, measurable by a fixed or established external standard, or by a standard apparent from the documents upon which plain-tiffs based their claim. See *Banish v. City of Hamtramck, supra,* and *Cree Coach Co. v. Wolverine Ins. Co.*, 366 Mich. 449, 115 N.W.2d 400 (1962).

*Currie* and to make available interest, as part of the damages awarded by the jury, only from the date of injury to the date of complaint.

Combining the principles of both the statute and *Currie,* we hold the following. In a wrongful death action, where a claim accrues as of.a date certain, the jury is to be instructed to include as part of its award of damages interest from the date of injury to the date the complaint was filed. When the verdict is returned the defendant shall immediately be liable for statutory interest from the date of the complaint to the date the judgment is paid computed in accordance with M.C.L.A. § 600.6013 (Stat.Ann.1970 Cum. Supp. § 27A.6013)."

### IV.

Accordingly, the judgment of the district court is affirmed in part and reversed in part. Plaintiff-Appellant Radco is awarded the sum of Two Hundred Fifty-Six Thousand One Hundred Dollars ($256,116.00) at six percent interest from April 23, 1974, the date of its payment to Trans-Pac. Each party is to bear its own costs.