**RELIANCE INSURANCE COMPANY OF PHILADELPHIA, PENNSYLVANIA, Appellant,**

v.

**Malcolm B. COLBERT et al., Appellees.**

**No. 19680.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 25, 1966.

Decided July 18, 1966.

---

**531**

Mr. Edward Gallagher for appellant.

Mr. Mark P. Friedlander, Washington, D. C., with whom Messrs. Mark P. Fried-

lander, Jr., Blaine P. Friedlander, Washington, D. C., and Harry P. Friedlander, Arlington, Va., were on the brief, for appellees.

Before EDGERTON, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

The District Court, after trial without a jury, gave judgment for $18,374 against a defaulting contractor and the surety upon a completicn bond. Only the surety has appealed, contending that material alterations were made in the construction contract without its knowledge and consent. We disagree with the District Court's conclusion that these alterations were of such a nature as to have no ponderable impact upon the surety's undertaking; and we reverse and remand for a determination of what that impact was.

**I**

Appellees are a group of church trustees who decided to build a Sunday School Annex. They executed a contract with a builder on October 20, 1962, and, on November 3 following, two addenda, the first enlarging the scope of the work to be done and the second fixing a total contract price and a payment schedule. Addendum No. 2 obligated the owner to reimburse the contractor for the full cost of a completion bond "at the time of delivery" of such bond. The contractor thereafter went to appellant surety company which, on November 21, 1962, issued and turned over to the contractor a completion bond. The bond remained in the possession of the contractor until after the execution of Addendum No. 3 on February 4, 1963.[1] Addendum No. 3 altered the payment schedule in several respects. Construction was eventually abandoned before the building was fin-

1. Addendum No. 3 recited that it was "to supersede all agreements, contracts, and addenda written previously, or alter or cancel any or all previous agreements as will be noted." With respect to the completion bond, Addendum No. 3 provided that "[P]ursuant and immediately after signing of this addendum, contractor will deliver into the hands of the building committee, a completion bond * * * and the owner agrees to pay the sum of * * * ($575) to cover the cost of this bond."

ished. Appellant surety refused the demand to complete, and this suit followed.

The District Court found, among other things, that the church had in substance been victimized by the contractor; that the architect employed by the church had been grossly negligent in giving his approval to the work performed by the contractor; and that the value of the materials and labor contributed by the contractor did not exceed $6,251. It arrived at its judgment of damages by this formula:

| | |
|---|---:|
| Amount of Contract | $57,450.00 |
| Deduct value of work done | 6,251.00 |
| Cost to complete | $51,199.00 |
| Deduct unpaid contract price | 32,825.00 |
| | $18,374.00 |

The District Court both found as a fact and concluded in law that the changes in the contract wrought by Addendum No. 3 "were not so substantial *vis-a-vis* the Bonding Company as to affect its security"; and that the surety "must be held to a strict accounting," since there had "been no changes in the contract which materially changed its position *vis-a-vis* the obligee * * *." The District Court also appeared to conclude that the surety was, in essence, estopped from relying upon Addendum No. 3 as constituting an alteration in the contract to which its bond was addressed. This latter position is embodied in a finding "that whatever obligation to give notice to the Bonding Company may have existed rested only upon the defendant Construction Company which had received but had failed to deliver the bond to the church until it had secured the signature of the Church to Addendum No. 3. The Church in other words had no knowledge of the bond until after Addendum No. 3 was signed."

## II

We turn first to the justification for the judgment derived from the estoppel alternative. The Church Trustees argued to us in this regard that "the bonding company made possible the overreaching of the Church by placing in the hands of the Construction Company an executed bond, and the bonding company must have known that that bond would cause the Trustees of the Church to feel secure * * *." This argument is curiously at odds with the District Court's purported finding of fact that the Church "had no knowledge of the bond until after Addendum No. 3 was signed." We have examined the record ourselves and we think the testimony does not support the finding literally.[2] The finding may perhaps be interpreted to mean that appellees did not actually see the bond, as distinct from knowing of its existence, at the time they executed Addendum No. 3; and the testimony was not adduced with such clarity as to ex-

---

2. Mr. Baylous, one of the trustees who signed Addendum No. 3, testified as follows:

"Q. Will you state whether or not before you executed the document, you presented this document (Addendum No. 3) to any bonding company? A. We didn't show it to anyone at all. Mr. Basay [the contractor] is the one that called for the bond and when the bond had arrived and we seen the bond and signed the bond, and we signed these papers here."

Mr. Custis, another trustee, testified somewhat confusedly but unmistakeably to the effect that the trustees signed Addendum No. 3 only after they had been satisfied as to the existence of the bond:

"Q. I show you Plaintiff's Exhibit No. 6 (the bond). Do you remember when you got that paper? A. This document was presented after we had received this addendum. Preceding this, he came back with this document because we did not agree to this until such time as the completion bond was presented to us.

* * * * *

"Q. Do you remember what Mr. Basay told you? A. Mr. Basay informed us that this, a completion bond, served a purpose for us that the work would continue under any conditions, that this was our protection, that if anything should happen that the building would be completed."

clude this possibility. Indeed, the finding must be read in this non-literal way in order to make it at all compatible with the theory of estoppel argued to us by appellees, namely, that the surety should not have given the bond to the contractor for ultimate delivery to the Church; and that, by doing so, the surety made it possible for the contractor to overreach the trustees by representing its possession of the bond to the trustees as an inducement to sign Addendum No. 3.

In our view of the estoppel argument, it is not critical whether appellees actually saw the bond or merely knew of its existence. Had appellees been given, or had they insisted upon, an opportunity to look at the bond, they would have found nothing in it authorizing future changes in the contract without notice to the obligor.[3] But, even if they had not seen the bond itself, they tell us in so many words that, because they knew of its availability in the contractor's hands, they could safely rely upon his representations that they would be protected by it even though they were to go ahead with a material alteration in the contract without notice to the surety. Although appellees, unfortunately, appear not to have been sophisticated men of business, they cannot reasonably have assumed that bonding companies customarily issue substantial completion bonds which are open-ended in relation to the terms of the contracts guaranteed. All that appellees were entitled to assume from bare knowledge of the existence of the bond was that it covered the contract in the form the latter was in as of the time the bond was issued, and not as it was about to be changed. The mere fact that the bond was in the contractor's possession does not enlarge the range of that assumption to include an apparent authority in the contractor to extend the bond's coverage to any new and different contract that might be made. Actual authority to bind the surety was, accordingly, necessary, and none has been proved.

■ Thus, even if appellees did not see the bond, such overreaching as caused them to execute Addendum No. 3 flowed from their readiness to rely upon whatever the contractor told them. But the coverage of the bond in fact is not to be defined by reference to those representations, absent an adequate basis for regarding them as binding upon appellant. Mere possession of the bond by the contractor affords no such basis, particularly where, as here, the contract provisions relating to the bond are not inconsistent with a conclusion that appellees contemplated that the bond would be procured in the first instance by the contractor. Thus, appellant was not estopped from showing what the coverage of the bond actually was.[4]

### III

We return to the first—and primary—ground advanced by the District Court, *i. e.,* its conclusion that the alterations made by Addendum No. 3 were not material in relation to the risk assumed by the surety. The payment schedule con-

---

3. The bond is a short form, and the date of its execution, November 21, 1962, clearly appears. It purports in terms to secure only a construction contract dated October 20, 1962. Addendum No. 3 was dated and executed February 4, 1963. Although Addenda Nos. 1 and 2 were executed November 3, 1962, they are not expressly referred to in the bond. There is no dispute, however, that they had been delivered to appellant prior to its issuance of the bond. Although a more careful surety would certainly have described the contract more precisely in the bond, we do not think that this omission entitled appellees to believe three months later that a further substantial alteration of the contract could safely be made without bringing it to the attention of the surety.

4. Cases holding the surety liable where it delivers to a contractor a bond which on its face gives no notice to the creditor of certain conditions or agreements are not applicable. See, *e. g.,* Butler v. United States, 88 U.S. (21 Wall) 272, 22 L.Ed. 614 (1874) ; Dair v. United States, 83 U.S. (16 Wall) 1, 21 L.Ed. 491 (1872) ; Title Guar. & Sur. Co. v. Schmidt, 213 F. 199, 201–203 (8th Cir. 1914).

tained in the contract before the advent of Addendum No. 3 called for an initial deposit of $7,450, and for successive payments of $12,500 upon completion of certain described phases of the construction. The comparative payment schedules provided by Addendum No. 2 and Addendum No. 3 are as follows:

|                                        | Addendum No. 2 | Addendum No. 3 |
| -------------------------------------- | -------------- | -------------- |
| Initial Deposit                        | $ 7,450        | $ 7,500        |
| Completion of first floor shell to joists | 12,500      | 10,000         |
| Completion of second floor joists      | 12,500         | 10,000         |
| Roofed in                              | 12,500         | 5,000          |
| Completion of job                      | 12,500         | 25,000         |

It was because of financing difficulties that Addendum No. 3 was formulated. Under it the trustees were themselves to provide current financing in the amount of $32,500, consisting of the pre-construction first payment of $7,500, and $25,000 to be paid in escrow. The contractor was to produce $25,000 against the receipt by him of a negotiable note for $25,000 signed by the trustees and secured by real and chattel mortgages on the Church property. Addendum No. 3 said that the initial deposit of $7,500 [sic] called for by the original contract was to be met by an immediate payment of $1450, plus $50, and release of $6000 which the trustees had already deposited in escrow some time before Addendum No. 3 was signed. The $25,000 to be paid into escrow by the trustees was to be released in successive amounts of $10,000, $10,000, and $5,000 as the three phases of construction prior to final completion were reached. Addendum No. 3 then added a new undertaking by the trustees to pay the contractor a 5 per cent commission on the $25,000 (or $1,250) which the contractor undertook in Addendum No. 3 to supply as a loan against the note.

■■■ Little discussion by way of comparison of Addenda Nos. 2 and 3 is necessary to demonstrate that the contract terms had undergone a substantial change, certainly of such a nature as to enable a surety to claim with reason that it should have had an opportunity to review its risk before deciding whether to adhere to its commitment to guarantee performance. A surety company is not a public utility. It may, for any or no reason, conclude not to furnish its bond with respect to a particular contract. When it has committed itself with respect to one contract, amendments which convert that agreement into a significantly different one should be brought to the attention of the surety so that it may exercise its own business judgment as to whether it wishes to continue its commitment. It is not for the parties to the contract to decide among themselves that their amendments are of no interest to the surety, at least when, as here, those amendments go beyond mere matters of form.

■■■ It may, of course, be entirely possible that notice to the surety of Addendum No. 3 would have evoked no cancellation of its bond. But the changes in the contract made by Addendum No. 3 are not such as to make this hypothesis a reasonably reliable one. Even a surety company as casual in its methods of operation as appellant appears on this record to have been might well have had second thoughts when it examined Addendum No. 3. We do not, therefore, feel warranted in attributing no significance to the fact that appellant was without opportunity to reappraise its commitment in the light of the contract as it took final shape through the instrumentality

of Addendum No. 3.[5] We do not, in sum, think that liability can be imposed upon the surety in this case, as was done in the District Court, because the contract alterations are held to be of no possible interest to it, or because it is estopped from asserting that such an interest did exist. The judgment against appellant is reversed because these foundations are inadequate support for it.

## IV

What we have said above, however, does not mean that appellant may under no circumstances be made to respond upon the bond in suit here. It can be argued, of course, that one who guarantees a contract and is given no chance to review that commitment in the light of significant alterations made in it without his knowledge or consent, should be released without having to face the vexations and uncertainties of litigation over the precise impact of such alterations upon him. The very prospect of such ensuing litigation would presumably be one of the reasons why the guarantor might decide to avail himself of the privilege of cancelling his commitment. Appellant, however, was not a volunteer, but a compensated surety, and one with a singular lack of interest in the fate of a bond which it put into circulation without having received the premium. We need not decide that under any and all circumstances a compensated surety is to be released only to the extent of demonstrable prejudice.[6] We do hold that, on this record, prejudice in fact shall be the standard of measurement of appellant's release from its undertaking. Inquiry must be made into the manner in which the risk undertaken by the surety was varied by the Church's failure to abide by the contract guaranteed, and the kind of prejudice that thereby resulted to the surety. If that prejudice proves impossible of rational measurement, the surety must receive a total discharge. If the prejudice is subject to measurement, the surety must receive only a partial discharge, measured by the extent of that prejudice.

The District Court has not as yet considered the matter in this light, nor have the parties been called upon to adduce their evidence and to make their representations with reference to this principle. Because the contract guaranteed was significantly altered by the parties without notice to the surety, thereby denying it the opportunity to bring its own complete discretion to bear upon whether it would continue to participate in the transaction, we think that the burden of persuasion on the issue of prejudice in this case should be on appellees.

We remand for further proceedings not inconsistent herewith.

It is so ordered.

TAMM, Circuit Judge (dissenting):

I regret that I am unable to join my brethren in their disposition of this case and must therefore respectfully dissent. My disagreement with the majority stems from its determination of the estoppel issue. I believe that, since this

---

5. A surety's obligation may, of course, be affected by departures in performance from the contract terms even without formal alteration. It is, thus, relevant to inquire into the extent which that occurred here. Addendum No. 2 provided for an initial down payment, and subsequent payments to follow as specified stages of the construction were satisfactorily completed. Sureties presumably rely on such payment provisions to provide a source of indemnity in case the contractor defaults. Apparently the result of the Church's failure to abide by Addendum No. 2 was that more money was paid to the contractor than he should have received by the time he finally abandoned construction. See generally and compare Gibbs v. Hartford Accident & Indemnity Co., 62 So.2d 599 (Fla.1952); RESTATEMENT, SECURITY, § 128, comment f, 344–46 (1941); SIMPSON, SURETYSHIP § 78 at 393, 396–400 (1950); 4 WILLISTON, CONTRACTS § 1243 at 3560, 3564 and n. 17 (1936); Arant, Rationale of the Rule that an Obligee's Premature Payment Discharges His Surety, 80 U.PA.L.REV. 842 (1932).

6. *Ibid.*

case is to be remanded in any event, we should also allow for inquiry into the question of whether the contractor used the bond to (in effect) defraud the appellees and, if he did, whether the appellant, because of its relation to the contractor and its negligent business practices, should be estopped to deny its liability on such bond. I believe the record in its present state strongly suggests that the contractor did use the bond to defraud these appellees; however, since the record is not entirely clear on this point, I would remand for additional evidence to clear up the confusion. If the evidence on remand demonstrates that the contractor did use the bond in such a manner, then the District Court should consider the question of whether appellant, through its negligent business practices, assisted the contractor in his fraud and whether appellant should therefore be estopped to deny liability.

In treating the estoppel issue, the majority focuses on the conduct of the appellees, and, although it finds the evidence on the point admittedly confused, it finds the appellees' "readiness to rely" on the contractor as determinative of the estoppel question. It seems to me that this sort of analysis is putting the cart before the horse. The question is: Were the appellees so "ready to rely" on the contractor because appellant gave the contractor an ambiguous bond which allowed him to induce such reliance from the appellees? I would suggest that the focus be shifted from the conduct of the appellees to the conduct of the contractor. The evidence of record on this point strongly suggests to me that he used the bond as a lever to induce the churchmen to go ahead with the project and that he was able to do so because of his close connection with appellant and because of appellant's failure to police his actions. Before discussing the evidence on this point, I think this case needs to be put into perspective.

The appellees wanted to add a Sunday School addition to their church. They contacted an architect recommended by one of the parishioners; bids were submitted, and three contractors submitted acceptable bids. Northeastern Construction Company was chosen for the job, however, primarily because its president, Mr. Basay, represented that he could assist the church in acquiring financing for the building. This was an important consideration to the church, because their assets on hand fell far short of the approximately $50,000 needed for the job.

Even before any financing arrangements had been made, Basay presented the churchmen with the construction contract. After reviewing the contract, one of the parishioners who was a lawyer recommended that, because such a large sum of money was involved, they should get a completion bond. Thereafter the churchmen conveyed the fact to the contractor that they wanted a completion bond for their "protection," and the contractor assured them that he would obtain such a bond. After the contract and Addenda No. 1 and No. 2 had been executed, the contractor and the churchmen visited several lending institutions, but were unable to obtain financing. At this point the contractor suggested that he would personally assist them in financing the project. To this end, Addendum No. 3 was executed, which appellees and the contractor believed only to extend to the financing aspects of the project. The contractor then began work and, after a short time, discontinued until the churchmen would pay him more than $5,000 for purported "extras," many of which were subsequently found to be nonexistent. He never returned to the job and this suit was instituted.

Focusing on the contractor for the moment, this picture emerges: it is apparent from the record that this contractor was a marginal operator who created a $57,000-plus financing scheme out of thin air, with little or no risk to himself (for which he received a "finder's fee" of $1,250 over and above the

contract price) ; [1] it is further apparent that the work he actually did was "wholly inadequate not of workmanlike quality, and not readily adaptable to correction." The architect who recommended the contractor admitted at trial that the work was "untidy, sloppy, and improperly done." Examination of the construction site after the contractor left the job proved that he had failed to put in some of the footers called for by the plans, that he had provided for only one toilet in the basement when the plans called for two, and that instead of building four new walls as called for by the plans, he used one preexisting wall which was not underpinned and which was found by other contractors to be absolutely worthless as a supporting wall. The District Court concluded on this point that, if the work were to go forward from the point where Basay left off, the better course would be to raze major portions and, in effect, "start from scratch."

Given the thoroughly demonstrated unreliability (if not downright dishonesty) of the contractor, I think it necessary for this court to give particularly close scrutiny to his activities at the time of the signing of Addendum No. 3 vis-a-vis the churchmen and the bond. I think that the record supports an inference that the contractor misrepresented to the churchmen that Addendum No. 3 was covered by the bond and that there was no reason for them to contact the bonding company.

In the first place, the contractor testified and the District Court found that the contractor did not believe himself that the addition of Addendum No. 3 changed the contract. He testified:

"This copy, Addendum No. 3, I never gave to the bonding company because, you see, as far as I was concerned at that time, the Addendum No. 3 was the provision of the loan, mostly the provision of the loan to the church people to make the job possible, *but we were not changing anything as far as the work was to be done or the contract price.*" (Emphasis added.)

The understanding of the churchmen with respect to Addendum No. 3, as expressed by one of the two churchmen who testified, comports with the explanation given by contractor Basay. The churchman testified:

(Cross-examination)

"Q. Now directing your attention, Mr. Baylous, to the second paragraph of this document [Addendum No. 3] which states, 'This addendum is to supersede all arrangements, contracts, and addenda written previously.' I believe you testified that you were familiar with that language?

A. That is right.

Q. What did you take it to mean?

A. I took it to mean that this—like when these papers were drawn up here, that this here explained the whole thing in detail and

---

1. The District Court had this to say about the financing operation:

"The church relied upon Basay to secure financing for the project and awarded the contract to him upon his assurances that he could secure the necessary financing; that at all times Basay wsa fully aware of the financial inability of the church to go forward without outside financing; that Basay knew, or should have known, under all the circumstances that the Church could not meet the financial conditions of the contracts as drawn by him; that the contracts were so designed as to reduce to Basay's possession the maximum of available cash with the least possible detriment to him in that all available cash would be paid to him when the building reached the earliest stage of completion; that he carried the work through to that stage of completion in a shoddy unworkmanlike manner, knowing as an expert builder that the workmanship was inadequate and would have to be replaced, that his so-called financing of the project through the stated escrow arrangement was a sham to place in the hands of his designated escrowee all cash which was or might become available to the Church while he submitted to the escrowee a valueless piece of paper—a check not covered by funds * * *."

that that has taken care of all of this in detail. I think that is what we take it to mean.

Q. You mean that this would replace all that had gone on before?

A. *Not replace it, bring it up all this to detail, how the payments were supposed to be stipulated, how the money was to be put and so forth and so on."* (Emphasis added.)

Further, it is apparent from the record that the contractor was "running the whole show" with respect to the explanation to the churchmen of the documents involved in the case. It was the contractor who drafted and explained the contract to the churchmen, and he did likewise with the addenda. As one churchman testified: "Mr. Basay explained this whole document to us and explained what he would expect of us."

Given the contractor's expressed belief that he didn't think Addendum No. 3 changed the relations between the parties, the churchmen's understanding to this effect, the dominant position of the contractor throughout, and his demonstrated dishonesty, it is not unreasonable to assume that he exploited his position and his possession of the bond to either confuse or deliberately mislead the churchmen with respect to the effect of the bond. The District Court specifically found that

"the understanding of the church [was] that the bond offered total protection to it *under any and all circumstances."* (Emphasis added.)

It is also apparent from the testimony of the churchmen that they were interested in *protection* and that they looked to the bond to give them such protection. The fact that the contractor had the bond in his possession gave them the assurance they needed to go ahead with the building. Moreover, although such does not expressly appear in the record, there is every possibility that the churchmen may have brought up the question of the applicability of the bond to Addendum No. 3, and the further

questions of whether the bond had been shown to appellant, or whether it would have to be presented to it. It does not take a great deal of imagination to form a mental image as to what this particular contractor might have said in response to questions of this type. It is precisely because we do not have evidence in the record on this point that I believe further testimony should be adduced.

If such evidence would be adduced and that which I believe to be only implicit in the record at present would become explicit, then the question of the appellant's responsibility for the actions of the contractor would have to be met. I think it would be profitable at this point to examine briefly the relationship of the appellant and the contractor and the actions of appellant with respect to the bond itself.

The contractor and appellant had done business prior to their negotiating the bond here in question on many occasions. In fact, the contractor testified that

"I was in touch with the bonding company just about every day or every other day because *I was receiving bonds constantly for different jobs, bid bonds as we put in bids for various jobs."* (Emphasis added.)

Moreover, the contractor testified that as of the date of his securing the bond (November 21, 1962), he did not believe that he had reached any final agreement with the church. He stated:

"After I received the bond, I held the bond until the proper time because at this time when I obtained it, we were not sure whether the job was still going to be effected or not. So, therefore, I kept it until such time as the final agreement was made."

We therefore find the appellant in the curious position of releasing into the hands of an unreliable contractor a completion bond on a contract which was not considered by the contractor to be in final form on a job that was not even certain to go through. The contractor then kept the bond in his possession for nearly three months before finalyz-

ing the contract with the church, apparently without any notice to appellant as to what was transpiring with regard to the bond and without paying the premium due on the bond.

It may also be profitable here to examine the bond which appellant had entrusted with this contractor for such a great length of time. The bond itself refers only to the contract dated October 20, 1962. It says nothing about any of the addenda. At the time the surety and the contractor entered into the bond agreement (November 21, 1962), the contractor presented to the surety addenda 1 and 2 (executed November 3, 1962). Thus the surety, in writing the bond, did so with reference only to the contract dated October 20, 1962, and did so by stating: "which contract is hereby referred to and made a part hereof as fully [and] as to the same extent as if copied at length herein." If the contract of October 20, 1962 were in fact to be "copied at length [therein]" it would not contain Addenda 1 and 2 and the bond would have reference only to the contract of October 20. The only way that Addenda 1 and 2 would be considered covered by the bond would be if the reference to the contract dated October 20, 1962 were interpreted to include any addenda entered into subsequent in time to the contract date, up to the date of the bond. It certainly would not be an unreasonable interpretation for the appellees, looking at the bond in February 1963, to read it to mean that Addenda 1 and 2 were covered by the bond even though not mentioned.

If the surety would sign a bond and release it to the contractor referring by its terms only to the contract of October 20, 1962, when it also had the addenda in its hands, it is not unreasonable to believe that the churchmen, seeing the October 20 date referring only to the contract and knowing that the surety had entered into the contract *after* the signing of the addenda, could believe that *all* addenda (including Addendum No. 3) subsequent in time to October 20 would be covered by the surety bond. In fact, the contractor may well have been able to explain the matter to the churchmen in such a manner so as to allay any fears they may have expressed as to the applicability of the bond to Addendum No. 3. Again, we don't know what the contractor said to the churchmen on this point, and I do not believe this case can fairly be decided until we do.

Finally with respect to the face of the bond itself, *it does not even disclose the extent of the surety's undertaking.* Anyone attempting to discover the extent of the surety's undertaking could only discover such by reference to the addenda wherein the penal sum was contained.

It seems to me that in view of all of the foregoing, the majority makes considerable more of the churchmen's responsibility for failing to notify the surety of Addendum No. 3 in this case than the record will support. The fact that the churchmen requested the contractor to secure the bond does not seem to me sufficient reason for visiting on their heads all of the sins of the contractor. In fact, their reliance in such a matter is in conformity with commercial practice in undertakings of the sort involved here. Typically the contractor will secure the bond, not the property owner.

There is much confusion in this case. Perhaps it could have been dispelled had the findings been more specific or had the subjects considered in this dissent been explored at greater length. But where there is confusion, I think it is our duty to send the case back to allow the parties and the court an opportunity to attempt to dispell such confusion, rather than to simply substitute our confusion for theirs.

I respectfully dissent.