MERGENTIME CORPORATION,
et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Defendant,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Counter-Defendant.

Civ. A. No. 89–1055(GHR).

United States District Court,
District of Columbia.

Oct. 4, 1991.

John R. Keys, Jr., Winston & Strawn, Washington, D.C. Robert S. Fischler, Winston & Strawn, New York City, for Ins. Co. of North America.

W. Stanfield Johnson, Crowell & Moring, Gerard J. Stief, Associate General Counsel, Washington Metropolitan Area Transit Authority, Washington, D.C., for Washington Metropolitan Area Transit Authority.

John F. Myers, Frank, Bernstein, Conaway & Goldman, Bethesda, Md., for Mergentime Corp.

Stephen A. Fennell, Steptoe & Johnson, Washington, D.C., for Perini Corp.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

This summary judgment motion arises out of an ongoing action for breach of contract between Plaintiffs Mergentime Corporation and Perini Corporation ("Mergentime/Perini"), and Defendant/Counter-Plaintiff Washington Metropolitan Area Transit Authority ("WMATA"). Jurisdiction in the underlying action is based on diversity of citizenship, 28 U.S.C. § 1332, and D.C.Code § 1–2439. The facts of both the underlying action and the instant motion relate to the construction of the U Street and Shaw Street Metro Stations along the Green Line, as part of the expansion of the Washington, D.C. Metro system. Counter–Defendant Insurance Company of North America ("INA") stood as surety for Plaintiffs under performance and payment bonds with regard to the original construction contracts at issue in the underlying action. INA and WMATA do not dispute that INA is a compensated surety as regards those bonds.

In August 1990, WMATA filed a supplemental counterclaim against INA in its capacity as surety under the original contracts, claiming that "INA is liable to WMATA under the performance bonds for any and all amounts which WMATA is entitled to recover against Mergentime and/or Perini." Def.'s Supplemental Countercl. Against Surety, at 3. INA served a timely answer denying its liability, and has filed a motion for summary judgment seeking dismissal of WMATA's counterclaim. It is this motion for summary judgment that is now before the Court. The parties have been heard at oral argument.

The gist of INA's argument is that Mergentime/Perini and WMATA made material modifications, without INA's prior notice and consent, to the two original construction contracts in a "Memorandum of Agreement" dated August 25, 1989. *See* Memorandum of Agreement, Def.'s Ex. 6 [hereinafter "Memorandum of Agreement"]. INA contends that these modifications dis-

charged it from all further obligations as surety under the bonds it signed in connection with those contracts. WMATA vigorously disputes this contention, pointing to language in the bonds and in the original contracts in which INA supposedly waived its rights to prior notification of contract modifications. WMATA also contends that there are material facts in dispute between it and INA, thus requiring denial of INA's motion.

At issue, therefore, is whether the modifications that WMATA and Mergentime/Perini made to the original construction contracts materially increased INA's risk as surety so as to entitle it to a complete discharge as a matter of law under the suretyship law of the District of Columbia. For the reasons set forth below, the Court holds that INA is not entitled to a complete discharge and accordingly denies its motion for summary judgment.

## I. FACTS

The factual circumstances giving rise to INA's motion are largely undisputed. On August 17, 1985, WMATA awarded a construction contract to Mergentime/Perini, as joint venturers, for construction of the Shaw Street Metro Station (Contract 1E0012). The amount of this contract was $50,895,000. Mergentime/Perini received a second, separate contract from WMATA on April 1, 1986, in the amount of $44,298,000, for construction of the U Street Metro Station. Each contract contained its own schedule of interim and final completion dates. The Shaw Street contract set a final completion date of March 6, 1989; the completion date under the U Street contract was August 2, 1989. *See* Pls.' Third Am. Compl. for Breach of Contract, Counter-Def.'s Ex. 4.

Although these contracts were entirely separate agreements, they contained identical provisions derived from WMATA's "General Provisions and Standard Specifications for Construction Projects" of 1973. *See* Def.'s Ex. 2 [hereinafter "General Provisions"]. INA and WMATA are in dispute over the meaning of two of those provisions, one of which concerned change or-

ders and the other payments procedures. Each contract contained the following provision pertaining to changes [hereinafter the "Changes clause"]:

3. CHANGES

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make any change in the work within the general scope of the contract, including but not limited to changes:

(1) in the specifications (including drawings and designs);

(2) in the method or manner of performance of the work;

(3) in the Authority-furnished facilities, equipment, materials, services, or site; or

(4) directing acceleration in the performance of work.

(b) Any other written order or an oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation or determination) from the Contracting Officer, which causes any such change, shall be treated as a change under this article, provided that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

Def.'s Ex. 2, at GP–1.

Each contract also contained the following payments clause provision [hereinafter the "Payments clause"]:

7. PAYMENTS TO CONTRACTOR

(a) The Authority [WMATA] will pay the contract price as hereinafter provided.

(b) The Authority will make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates approved by the Contracting Officer....

. . . .

(d) In making such progress payments, there shall be retained 10 percent of the estimated amount until final completion and acceptance of the contract work. However, if the Contracting Officer, at any time after 50 percent of the work has been completed, finds that satisfactory progress is being made, he may authorize any of the remaining progress payments to be made in full. Also, whenever the work is substantially complete, the Contracting Officer, if he considers the amount retained to be in excess of the amount adequate for the protection of the Authority [WMATA], at his discretion, may release to the Contractor all or a portion of such excess amount.

*Id.* at GP–3.

It was with regard to these two construction contracts that INA entered into a suretyship relationship with Mergentime/Perini. On August 20, 1985, INA executed performance and payments bonds for Mergentime/Perini in the amount of $50,895,-000 pursuant to the Shaw Street Contract. On April 7, 1986, INA executed similar bonds for Mergentime/Perini in the amount of $44,298,000 pursuant to the U Street Contract. Each performance bond contained the following identical provision:

NOW, THEREFORE, if the Principal shall perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of the said contract during the original term of the said contract *and any extensions therefore that may be granted by the Authority, with or without notice to the Surety(ies),* and during the life of any guaranty required under the contract, and shall also perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of any *and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the Surety(ies) being hereby waived,* then the above obligation shall be void and of no effect.

Def.'s Ex. 1 (emphasis added). WMATA argues that this language in the two performance bonds, as well as the Changes and Payments clauses in the construction contracts, expressly relieved it of any obligation to notify or obtain the prior consent of INA with regard to subsequent modifications in work and payment scheduling, including the modifications memorialized in

and following from the August 25, 1989 Memorandum of Agreement. INA argues that the language of waiver in the performance bonds, quoted above, does not apply because the modifications in the Memorandum of Agreement were not "duly authorized" according to the terms of the two construction contracts.

Relations between the Mergentime/Perini joint venture and WMATA deteriorated soon after the signing of the two construction contracts, and Mergentime/Perini filed its first complaint against WMATA in April 1989. After WMATA's initial dispositive motions were denied, WMATA filed an answer and counterclaim on August 14, 1989. But the parties also negotiated a settlement of some of their differences in an effort to expedite completion of the two construction projects. This settlement was memorialized in the August 25, 1989 Memorandum of Agreement. See Def.'s Ex. 6. It is this document that INA contends constituted a "comprehensive agreement," Counterdef.'s Mem. at 3, amounting to "a new and radically different contract altogether," by which "two smaller projects [became] one single mega-project." Id. at 5.

INA and WMATA agree that the Memorandum of Agreement made certain changes to the original construction contracts. Specifically, according to the Memorandum of Agreement:

1) Mergentime/Perini was allowed to combine its performance of the two construction contracts into a "unified operation." Def.'s Ex. 3, at 3.

2) Certain interim and the final completion dates for work under each of the construction contracts were extended. Id. at 3–4.

3) The parties agreed to try to resolve differences over payments to Mergentime/Perini under the construction contracts by September 1, 1989. Id. at 7.[1]

Apart from these modifications, the Memorandum of Agreement expressly reserved the terms and conditions of the original construction contracts.[2]

With regard to payment modifications, WMATA and Mergentime/Perini did reach a supplemental agreement by September 1, 1989, followed by three more supplemental agreements which also dealt with claims for payment. See Counterdef.'s Ex. 7. WMATA made over $6 million in payments to Mergentime/Perini pursuant to the August 25 agreement, over and above regular progress payments under the original contracts. See Def.'s Mem. at 6; Mergelsberg Aff. at 9. In addition, WMATA released to Mergentime/Perini over $1 million in retainage payments.[3]

INA claims that these modifications, effected without its knowledge or consent, materially and substantially altered the original contractual relationships between WMATA and Mergentime/Perini, thereby discharging INA from its obligations as surety. While not denying that the Memorandum of Agreement contains the above-mentioned provisions and that it made the additional payments to Mergentime/Perini as alleged, WMATA stresses that the scope of the original construction contracts remained essentially unaltered. WMATA contends, in effect, that the August 25 agreement amounted to no more than a modification within the terms of the original two construction contracts that was

---

1. Mergentime/Perini and WMATA also agreed to relinquish certain rights to terminate either contract on grounds of default and to be relieved from performance as a result of events occurring prior to August 25, 1989. Def.'s Ex. 3, at 6. WMATA also agreed to review Mergentime's claims for excusable delay with a view to eliminating liquidated damage claims based on delay on both contracts. Id. at 5. INA cites these two provisions of the Memorandum of Agreement as further evidence that the August 25, 1989 agreement prejudiced its position as surety. See Counterdef.'s Mem. at 5.

2. The Memorandum of Agreement contains the following provision:

   10. Except as provided herein, all terms and conditions of the two contracts including the rights and claims of the parties thereunder remain unchanged.

   Def.'s Ex. 3, at 7.

3. This figure comprised $885,000 held as a security fund pursuant to the U Street Station contract, and $275,000 similarly held pursuant to the Shaw Street Station contract. Mergelsgerg Aff. at 10.

necessary to keep Mergentime/Perini working on the projects, and not, as INA claims, a wholly new contract.[4]

## II. DISCUSSION

### A) *Summary Judgment Standard*

A party bringing a summary judgment motion must "show that there is no genuine issue as to any material fact" and that he is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If this burden is met, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The materiality inquiry is a function of the substantive law governing the case. *Id.* The Court is to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. In reviewing the facts presented, "all inferences to be drawn ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable ..., or is not significantly probative, ... summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (discussing the showing of evidence required of a nonmoving party). Summary judgment is also proper when, as here, there are disagreements over contract construction and interpretation that do not implicate the intent of the parties. *See* 10A Charles Alan Wright et al, *Federal Practice and Procedure* § 2730.1, at 280–81 (2d. ed. 1983 & Supp.1991) (citing cases).

### B) *Standard For Discharge of a Compensated Surety*

INA correctly suggests that the substantive law of suretyship applicable to this case—determining whether and when a surety is entitled to a discharge as a result of a material alteration to a construction contract—is not well settled in the District of Columbia. This Court has found no statute that addresses the question, and only one case that does so. *See Reliance Ins. Co. of Philadelphia v. Colbert*, 365 F.2d 530 (D.C.Cir.1966). Partly because its holding appears limited to its unusual facts, *Reliance* does not provide a clear rule of general applicability in these matters, and WMATA and INA not surprisingly read the opinion quite differently.

Accordingly, INA urges this Court to follow cases that hold that material alterations to an underlying contract without the

---

**4.** In its opposition to INA's motion, WMATA draws the Court's attention to several meetings that occurred in the spring of 1990 between representatives of the parties. Those meetings, according to WMATA, were for the purpose of discussing the status of the Shaw Street and U Street projects. WMATA contends, from notes it submitted as exhibits to its memorandum in opposition, that not only was an INA representative in attendance at those meetings, and was aware of the existence of the Memorandum of Agreement and of continuing problems in completion of the projects, but that the INA representative indicated that INA would "stand behind its bond." Thus, WMATA argues, INA had

notice of the Memorandum of Agreement and assented to it.

INA, in its reply memorandum, disputes that its conduct constituted a valid waiver of its rights. It further denies that the notes proffered by WMATA support WMATA's assertion that INA assented in any way to the modifications contained in the Memorandum of Agreement.

Because the present motion can be decided on the basis of the facts set forth above, the Court need not address WMATA's contention that INA ratified the modifications to the construction contracts.

consent of the surety will discharge the surety from its obligations under a bond, without a separate showing of prejudice to the surety. *See U.S. v. Freel,* 186 U.S. 309, 316, 22 S.Ct. 875, 878, 46 L.Ed. 1177 (1902); *Chas. H. Tompkins Co. v. Lumbermens Mutual Casualty Co.,* 732 F.Supp. 1368, 1377–78 (E.D.Va.1990); *Southwood Builders, Inc. v. Peerless Ins. Co.,* 235 Va. 164, 366 S.E.2d 104, 107–8 (1988). INA places particular emphasis on *Southwood Builders.* In that case, the Supreme Court of Virginia, affirming a lower court, held that a prime contractor's material modification of a subcontract, without notification to the compensated surety who had issued a performance bond for the subcontractor, discharged the surety from its obligations under the bond. *Southwood Builders,* 366 S.E.2d at 105, 107–8. The modifications at issue in that case concerned payments to the sub by the general contractor, Southwood Builders, in advance of progress payments scheduled under the original contract. *Id.* at 105–6. These prepayments were not approved in accordance with the terms of the contract between Southwood and its sub. *Id.* at 105. In holding that these unauthorized prepayments constituted material modifications warranting discharge of the surety, the Virginia Supreme Court rejected a two-pronged test that would require a showing of *both* 1) a material variation in the principal contract, *and* 2) prejudice to the surety. *Id.* at 108. Instead, the court stated that

[a] separate showing of prejudice to the surety is unnecessary because a material deviation, in itself, establishes sufficient prejudice.... In this case, the material deviation is established by proof that the subcontractor was paid money before it was due and without approval by the architects. Such a procedure diminishes funds that should have been available in case of default, eliminates the architects' assurance that payments to the contractor are being used for the job, and undermines the inducement to the contract to finish the work on schedule in order to be paid.

*Id.*

This rationale has often been invoked in support of the rule that a surety is discharged if the obligee makes unauthorized advance payments to the principal, a rule which itself has been described as a corollary to a traditional rule of suretyship, that a surety is discharged if the contract the surety has guaranteed is altered without the surety's consent, *see Argonaut Ins. Co. v. Town of Cloverdale,* 699 F.2d 417, 419 (7th Cir.1983); 10 Samuel Williston, *A Treatise on the Law of Contracts* § 1243, at 777 & nn. 4–5 (Walter H.E. Jaeger ed., 3d ed. 1967 & Supp.1991) (citing cases). The theory for this corollary rule is that unauthorized prepayments to a principal increase the surety's risk. This theory, however, has come under criticism, and "may well be just a vestige of an era when sureties were usually not compensated and therefore were treated with a judicial tenderness that they do not deserve today." *Argonaut Ins. Co.,* 699 F.2d at 419. As Judge Posner has pointed out, "whether the advances increase the surety's risk depends on what the principal did with them; if he used them on the project the amount at risk to the surety may be unaffected." *Id.* In other words, a material modification to a contract is not the same as a modification that materially increases the surety's risk.

A number of courts of appeals which have recently considered the circumstances under which a compensated surety may be discharged from its bond obligations have required a showing of injury or prejudice to the surety as well as proof of material modification to the underlying contract. *See United States v. Reliance Ins. Co.,* 799 F.2d 1382, 1385 (9th Cir.1986); *Argonaut Ins. Co.,* 699 F.2d at 419–20; *Ramada Dev. Co. v. United States Fidelity & Guar. Co.,* 626 F.2d 517, 521–22 (6th Cir.1980); *Continental Bank & Trust Co. v. American Bonding Co.,* 605 F.2d 1049, 1056 (8th Cir.1979). This Court is of the opinion that this trend in the law comes closer to what the court of appeals for this circuit actually did in *Reliance Ins. Co. v. Colbert,* 365 F.2d 530 (D.C.Cir.1966), than does the *Southwood* decision urged by

INA. *Reliance* involved a group of church trustees who altered the payment schedule of a contract for the construction of a Sunday School annex *after* the contractor had obtained a completion bond from the plaintiff. 365 F.2d at 531. When the contractor subsequently defaulted, the surety refused demand to complete. *Id.* at 531–32. In reversing the district court, the court of appeals held that when the surety had no knowledge of the contract amendment, and thus no "opportunity to review its risk before deciding whether to adhere to its commitment to guarantee performance," *id.* at 534, the appropriate inquiry should not be merely whether the amendments materially altered the principal contract, but also whether the surety was thereby prejudiced in fact. The court of appeals stated:

> We ... hold that, on this record, prejudice in fact shall be the standard of measurement of appellant's release from its undertaking. Inquiry must be made into the manner in which the risk undertaken by the surety was varied by the Church's failure to abide by the contract guaranteed, and the kind of prejudice that thereby resulted to the surety. If that prejudice proves impossible of rational measurement, the surety must receive a total discharge. If the prejudice is subject to measurement, the surety must receive only a partial discharge, measured by the extent of that prejudice.

*Id.* at 535. The court of appeals, however, did not rule out completely the possibility that the surety might be held liable on its bond after retrial.[5] Nevertheless, the court of appeals declined to use the *Reliance* case to adopt a rule of more general applicability to decide under what circumstances a compensated surety to a construction contract could receive a discharge after the principal and obligee modified the principal contract.[6]

Notwithstanding the limited reach of the holding in *Reliance*, the court of appeals appears to have been guided in its decision by the Restatement of Security § 128(b) cmt. f (1941), which it cited in footnotes. *See Reliance Ins. Co.*, 365 F.2d at 535 nn. 5–6. Section 128(b) provides that

> Where, without the surety's consent, the principal and creditor modify their contract otherwise than by extension of time of payment ...
> (b) the compensated surety is
> (i) discharged if the modification materially increases his risk, and
> (ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification.

Rest. of Surety § 128(b). Comment f applies section 128(b) to the building contracts in four contexts. Comment f states in pertinent part:

> The modifications of contract between creditor and principal may be such as are contemplated by the contract in which case no surety would be discharged. They may be slight variations which by the technical rules which have prevailed in respect to non-compensated sureties would discharge them, although not in fact disadvantageous to the surety. In such a case the compensated surety would not be discharged. They may cause slight and easily measured damage to the compensated surety, so that the penalty of a total discharge of the surety would be disproportionate to the blame attaching to the creditor for the modification. In such a case the surety is discharged only to the extent of the loss. The compensated surety, however, should not be held to his obligation if the creditor and principal have so modified the contract as to impose a risk of loss substantially different from the one covered by his obligation. If the change

---

5. "What we have said above, however, does not mean that [Reliance] may under no circumstances be made to respond upon the bond in suit here." 365 F.2d at 535.

6. "We need not decide that under any and all circumstances a compensated surety is to be

released only to the extent of demonstrable prejudice." 365 F.2d at 535. The court did note that on the facts of the case Reliance appeared to have been "casual" in looking after its interests. *Id.* at 534.

imposes a danger of loss upon the surety which cannot fairly be measured, the surety is discharged entirely.

*Id.* cmt. f., at 344–45.

This Court is of the opinion that this test describes the one actually followed by the court of appeals in *Reliance Ins. Co. v. Colbert,* 365 F.2d at 535. It is in keeping with the recent trend in the suretyship cases cited above. *See, e.g., United States v. Reliance Ins. Co.,* 799 F.2d at 1385; *Argonaut Ins. Co. v. Town of Cloverdale,* 699 F.2d at 419–20; *Ramada Dev. Co. v. United States Fidelity & Guaranty Co.,* 626 F.2d at 521–22. Read in the light of Restatement of Security § 128(b) comment f, therefore, the Court believes that *Reliance* controls the present dispute between INA and WMATA. Following the *Reliance* court, WMATA as obligee bears the burden of persuasion on the issue of prejudice. *See Reliance Ins. Co. v. Colbert,* 365 F.2d at 535. In resisting INA's motion for summary judgment, therefore, WMATA must go beyond the pleadings and, by any of the evidentiary materials listed in Rule 56(c), including affidavits, show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553.

### C) *The Memorandum of Agreement of August 25, 1989*

■ With regard to the effects of the Memorandum of Agreement on the original construction contracts between WMATA and Mergentime/Perini, it is clear from the text of the performance bonds executed by INA that INA waived the right to prior notice of "any and all duly authorized modifications" of the original contracts. Counterdef.'s Ex. 1. The question here is whether the modifications memorialized in the Memorandum of Agreement were "duly authorized." In oral argument, INA correctly pointed out that the "Changes" clause of each contract, quoted above, requires that modifications be designated as "change orders" for the no-waiver language to have effect, and that the Memorandum of Agreement was not so designated. Thus, as a technical matter, the no-waiver language, to which WMATA points, does not apply to the Memorandum of Agreement. INA further contends that this was no mere technical failure to follow the changes procedures originally agreed to by all the parties, but rather a fundamental recasting of the relationship between WMATA and Mergentime/Perini so as to amount to a wholly new contract.

While the Court agrees that WMATA and Mergentime/Perini modified their contractual relationship in the Memorandum of Agreement without resort to the label "change order," the Court is not convinced that the modifications which WMATA and Mergentime/Perini made to the original construction contracts in the Memorandum of Agreement were so sweeping as to amount to an entirely new agreement. What WMATA and Mergentime/Perini essentially did was to adjust performance and payment schedules to keep Mergentime on the job. The parties agreed to allow Mergentime/Perini to combine the allocation of labor and materials to "increase its efficiency in performing the work" on the two projects. Mergelsberg Aff. at 8. The parties also attempted to resolve some outstanding disputes arising from delays in performance. WMATA and Mergentime/Perini otherwise expressly retained "all terms and conditions of the two contracts including the rights and claims of the parties." Memorandum of Agreement para. 10, Def.'s Ex. 3 at 7.

This latter provision, viewed in the context of the Memorandum of Agreement as a whole, contradicts INA's contention that a wholly new and radically different contractual relationship was created between INA and WMATA in August of 1989 from which prejudice might be inferred. *See* Mergelsberg Aff. at 4–7. That the Memorandum of Agreement gave Mergentime/Perini authority to unify its *operations* under the two construction contracts does not mean that those contracts were obliterated or superseded. Rather, the performance changes memorialized in the Memorandum of Agreement appear to be within the scope of the Changes clause quoted above, in that they were changes "in the method or manner of performance

of the work." *see* General Provisions para. 3(a)(2), Def.'s Ex. 2 at GP–1. Had the parties designated the Memorandum of Agreement to be a change order, INA would not have been entitled to prior notice of them. Thus, although the Memorandum of Agreement may not have been "duly authorized" according to the terms of the original construction contracts in so far as notice to INA was concerned, the record does not indicate that the changes memorialized in that document constituted a new agreement or were even necessarily disadvantageous to the surety. Under the *Reliance* standard as interpreted forth above, therefore, INA is not entitled to a complete discharge on the basis of the Memorandum of Agreement itself.

### D) *Additional Payments to Mergentime/Perini*

■ With regard to the additional payments of over $6 million to Mergentime/Perini, the matter is more complicated. The original construction contracts authorized WMATA to make progress payments monthly as work proceeded or "at more frequent intervals as determined by the Contracting Officer." General Provisions para. 7(b), Def.'s Ex. 2 at GP–2. Although this section of the Payments clause does not contain a waiver provision with regard to notice to the surety, the clause itself—in the very contracts that INA insured—contemplates modifications in the payment schedule. In short, to the extent that the $6 million paid out by WMATA beyond regularly scheduled progress payments went "to settle certain claims for extra compensation that had been submitted" by Mergentime/Perini, Mergelsberg Aff. para. 15, these payments were duly authorized by the contracts. Moreover, in the Memorandum of Agreement Mergentime/Perini represented "that the payments made by WMATA under the payment schedule to be agreed between the parties shall be applied in substantial part to progress the work on the contract for which the payment is issued." Def.'s Ex. 3, para. 9 at 7.

INA, however, calls the Court's attention to paragraph 30 of WMATA's Amended Counterclaim against Mergentime/Perini, which WMATA incorporated by reference in its Supplemental Counterclaim Against Surety. *See* Counterdef.'s Reply Mem. at 2; Counterdef.'s Ex. 3 at 26; Counterdef.'s Ex. 8, para. 33 at 2. In its Amended Counterclaim, WMATA claims that $3 million of the $6 million allegedly paid to Mergentime/Perini was without a factual basis and therefore constituted overpayment. The significance of WMATA's claim for overpayment, according to INA, is that it shows that half of $6 million in additional payments to Mergentime/Perini pursuant to the Memorandum of Agreement were *not* applied to the combined project, and that "the contract balances left for completion of the projects have been diminished by that same extent." Counterdef.'s Mem. at 20.

The inference to be drawn from INA's claim, in light of the *Reliance* test, is that INA may be entitled to discharge from its bond obligations to the extent of $3 million if it can be shown that this alleged overpayment, if in fact it *was* without a factual basis, prejudiced INA. WMATA disputes INA's claim of prejudice generally with regard to the entire $6 million, *see* Def.'s Statement of Disputed Material Facts para. 5, but does not address INA's specific contention that the alleged overpayments of $3 million were not used to keep Mergentime/Perini at work on the two construction projects. Yet WMATA's claim for overpayment was made initially against Mergentime/Perini, and proof of that claim properly belongs in the pending action between those parties. For the Court to grant partial summary judgment to INA on the grounds that WMATA's alleged overpayment of $3 million to Mergentime/Perini prejudiced INA's rights as surety would be to prejudge an issue upon which the Court has yet to receive any evidence. In view of the state of the record at this time, therefore, the Court cannot say whether INA was prejudiced by WMATA's alleged overpayment to Mergentime/Perini in the amount of $3 million. The best that can be said is that there is a genuine issue of material fact for trial.

### E) *Prepayment of Retainage Funds*

█ With regard to the prepayment of retainage funds in excess of $1 million, WMATA does not contest that its release of those funds occurred before Mergentime/Perini had completed over 50% of the work on either construction project. The relevant subsection of the Payments clause in the original construction contracts expressly authorized the Contracting Officer to release retainage funds only *after* 50% of the work had been completed. General Provisions para. 7(d), Def.'s Ex. 2 at GP–3. Thus, the prepayment of these retainage funds was not "duly authorized" within the terms of INA's bonds, and outside the scope of INA's waiver of prior notice.

Under the *Reliance* test as interpreted above, however, the unauthorized prepayment of retainage funds without INA's prior notice or consent is not automatically grounds for discharge. INA will not be discharged on its motion for summary judgment if WMATA meets its burden of producing "evidentiary materials" showing there to be a genuine issue for trial on the lack of prejudice in fact to INA's suretyship interests from the unauthorized prepayment of retainage funds. *Reliance Ins. Co. v. Colbert*, 365 F.2d at 535; Restatement of Security § 128(b); *see also Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. WMATA has met its burden on this issue by presenting evidence that it released these funds "to keep [Mergentime/Perini] working on the Shaw and U Street Projects, to prevent further delays caused by [Mergentime/Perini] to the Projects, and, for at least a time, to avert the need to terminate [Mergentime/Perini]." Mergelsberg Aff. para. 16. As discussed above, prepayment of retainage funds may not prejudice the surety if the principal uses the funds to keep working on job. *See Argonaut Ins. Co. v. Town of Cloverdale*, 699 F.2d at 419 (Posner, J.); *Ramada Dev. Co. v. United States Fidelity & Guar. Co.*, 626 F.2d at 522; Rest. of Security § 128(b) cmt. f. Thus, a triable issue of material fact remains on the issue of prejudice to INA from WMATA's unauthorized release of retainage funds to Mergentime/Perini without prior notice.

### III. CONCLUSION

Accordingly, INA's motion for summary judgment is denied. INA may be entitled to a partial discharge from its bond obligations to WMATA, but that determination must await trial on the merits under the appropriate legal standard.